THE AAKRE.
Petition of REDERI A/S HENNESEID.
WATERMAN et al. v. AAKRE.

District Court, S. D. New York.
Dec. 29, 1939.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, W. J. Nunnally, Jr., and F. Herbert Prem, all of New York City, of counsel), for claimant in limitation cause and for libelants.

. Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin, Wharton Poor, and James McKown, Jr., all of New York, City, of counsel), for the owner of Aakre.

Burlingham, Veeder, Clark & Hupper, of New York City (John L. Galey and Burton H. White, both of New York City, of counsel), for Lamport & Holt Line, Ltd.

Crawford & Sprague, of New York City (George C. Sprague and Nicholas J. Healy, III, both of New York City, of counsel), for Continental Grain Co.

WOOLSEY, District Judge.

My judgment in this cause is that the petitioner is entitled to a decree, with costs, exonerating it from liability and that there must be a dismissal, with costs, of the libel as against the Aakre, her owner, the Lamport & Holt Line, Ltd., and all the impleaded respondents.

I shall deal hereinafter with the question of costs as between the libelant and the impleaded respondent and as between them inter sese.

I. My subject matter jurisdiction herein is based on the fact that this is a cause in admiralty, Title 28 United States Code, Section 41(3), 28 U.S.C.A. § 41(3).

II. The Aakre is a steel, single screw, Norwegian motor vessel of 4,138 tons gross and 2,336 tons net, built in 1926 at Malmo, Sweden, and registered in Porsgrunn, Norway. She is 377.6 feet long, 54 feet wide and 22.9 feet deep. Her deadweight capacity is 7,090 tons.

On October 28, 1937, at 9 p. m., the Aakre sailed from St. John, New Brunswick, for Buenos Aires, having on board some 88,900 cases of potatoes, which constituted practically her entire cargo.

At about 4:20 on the morning of October 29, 1937, the vessel stranded on Cheney Island near Grand Manan Island in the Bay of Fundy, and remained aground for several days.

A large quantity of the potatoes were jettisoned in order to float the vessel and, as a result of delay and rehandling, much damage was suffered by the remainder of the cargo which became practically worthless.

III. The proceedings involved in this cause were commenced by the owners of the cargo filing a libel in rem against the Aakre, and in personam against Rederi A/S Henneseid, her owner—hereinafter called the shipowner—and Lamport & Holt Line, Ltd., her subcharterer—hereinafter called Lamport—claiming damages in the sum of $220,000.

Lamport thereupon filed a petition impleading Continental Grain Company—hereinafter called Continental—the time charterer of the Aakre, alleging that if there was any liability on its part it was due to a breach of the warranty of seaworthiness contained in the sub-time charter between the said parties.

The shipowner thereupon filed a petition for exoneration from or limitation of its liability, alleging that the stranding was caused by an error in navigation, and the usual injunction was issued restraining prosecution of the libel or claims involved therein otherwise than in the limitation proceeding.

Claims were filed in the limitation proceeding by the cargo claimants.

Contingent claims were also filed by Lamport and Continental for the sums for which, if held, they might be respectively liable.

Thereupon Lamport and Continental moved for orders modifying the restraining order in the limitation proceeding so as to permit them to file petitions impleading the shipowner in the cargo suit, and for consolidation of both causes for all purposes. The parties consented to the consolidation, and Judge Clancy granted the motions for modification of the restraining order to permit this impleading, and thus settle the rights of all the parties in one proceeding. The Aakre (Motions) 1938 A.M.C. 1370.

Accordingly thereafter third party petitions were filed by Lamport and Continental impleading the shipowner in the suit for cargo damage.

A cross petition was thereupon filed by the shipowner against both Lamport and Continental alleging, in substance, that if the bills of lading imposed greater liabilities on the shipowner or on the Aakre than were imposed by the charter from the shipowner to Continental then the shipowner would be entitled to be indemnified by Lamport and Continental for the consequences of any such excess liabilities.

A similar cross-petition was filed against Lamport by Continental demanding that if it should be held liable to indemnify the shipowner in any amount, Lamport should in turn indemnify it therefor.

IV. The Aakre was under time charter to Continental and was subchartered on an identic form of time charter, mutatis mutandis, by Continental to Lamport.

Lamport's agent, under date of October 28, 1937, signed, at St. John, New Brunswick, on its behalf the bills of lading issued for the cargo shipped on the Aakre at St. John.

A. It is common ground that the Canadian Water Carriage of Goods Act 1936, and its Schedule of Rules applied to the Aakre's cargo.

The Water Carriage of Goods Act 1936 of Canada provides as far as here relevant:

"2. Subject to the provisions of this Act, the Rules relating to bills of lading as contained in the Schedule to this Act (hereinafter referred to as "the Rules") shall have effect in relation to and in connection with the carriage of goods by water in ships carrying goods from any port in Canada to any other port whether in or outside Canada.

"3. There shall not be implied in any contract for the carriage of goods by water to which the Rules apply any absolute undertaking by the carrier of the goods to provide a seaworthy ship.

"4. Every bill of lading, or similar document of title issued in Canada which contains or is evidence of any contract to which the Rules apply shall contain an express statement that it is to have effect subject to the provisions of the Rules as applied by this Act."

B. Turning to the Schedule of Rules relating to bills of lading, article IV, subdivision 1, provides:

"1. Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped and supplied, and to make the holds, refrigerating and cool chambers

and all other parts of the ship in which goods are carried fit and safe for their reception, carriage and preservation in accordance with the provisions of Paragraph I of Article III.

"Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this section."

Article IV of said Schedule, subdivision 2, provides, inter alia:

"2. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from,

"(a) act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship: * * *

"(c) perils, danger, and accidents of the sea or other navigable waters."

█ Under the Canadian Water Carriage of Goods Act 1936, and its annexed Rules, it is, therefore, explicit that the burden of proving unseaworthiness is cast on cargo, and, if unseaworthiness is shown, the burden is then cast on the shipowner— if it wishes to escape liability—to go on with the evidence and to show that due diligence was used by it to make the ship seaworthy.

Under the Canadian Act due diligence is *not* made a proviso of any of the exceptions, but is to be considered separably therefrom.

C. The cargo claims, however, that by reason of clause 4 in the bills of lading issued by the sub-charterer, Lamport, the use of due diligence to make the vessel seaworthy is imported into the contract between cargo and ship *as a proviso* to be proved by the ship before she can take advantage of any exceptions, and that therefore the shipowner has waived such advantages with regard to the burden of proof as the Canadian Act and its scheduled Rules would otherwise have given to it, in respect of the stranding herein involved and the consequent loss therefrom.

As this is in the way of being a structural matter on the question of proof, I think that it should be disposed of in the early part of this opinion.

Now paragraph 4 of the bills of lading on which cargo bases its claim of waiver of the statute provides inter alia as follows (italics mine):

"4. The company shall not be responsible for delay, loss, damage or default before, during or after loading, transportation or discharge occasioned by any of the following Excepted Causes: The Act of God, perils of the seas or canals or other waters or of navigation or maneuvering of whatsoever nature or kind * * * accidents to or from machinery or breakage thereof, any latent defect in hull, machinery, refrigerating machinery, appurtenances or gear or unseaworthiness of any kind, whether existing at the time of shipment or at the beginning of the voyage, faults, errors or omissions in the navigation or management of the vessel, whether by the Company's employees or pilots or others, *provided that due diligence shall have been exercised to make the vessel or any craft seaworthy and properly manned, equipped and supplied.*"

Any waiver which might be spelled out of this proviso under the doctrine of cases like The Poleric, D.C., 17 F.2d 513, 514-516; affirmed sub nomine Bank Line v. Porter, 4 Cir., 25 F.2d 843, 846, and Virginia Carolina Chemical Company v. Norfolk and North America Steam Shipping Company (1912) 1 K.B. 229, 236-246, is canceled by paragraph 7 of the bills of lading, which provides inter alia (italics mine):

"7. * * * From the time when the goods are loaded on to the time when they are discharged from the ship, this bill of lading, so far as it relates to the carriage of goods by water, shall have effect subject to all the terms and provisions of the Act of the Congress of the United States, approved April 16, 1936 entitled *'Carriage of Goods by Sea Act'* (United States Code, Title 46, Chapter 28, 46 U.S.C.A. §§ 1300–1315) which exclusively to the extent thereof are in effect while the goods are aboard ship: *unless this shipment originate at any port in Canada, in which event this bill of lading, so far as it relates to the carriage of goods by water, shall have effect, subject to all the terms and provisions of 'The Water Carriage of Goods Act 1936'* enacted by the Parliament of the Dominion of Canada, *which exclusively to the extent thereof are in effect while the goods are aboard ship,* and this shipment will be then subject to the terms and provisions of Canada Shipping Act, 1934, as amended, and any other enactments of the Dominion of Canada in force relating to the limitation of the liability of the owners of vessels."

If this provision of the bill of lading contract that the Water Carriage of Goods Act

1936 of Canada should apply *"exclusively"* to goods shipped at a Canadian port does not wholly destroy all basis for the cargo's argument that the terms of the Canadian Act were waived or in any way diluted, it certainly removes this cause entirely from the zone of plain proof of waiver of a statutory exemption which the courts require, e. g. The Ida, 2 Cir., 75 F.2d 278, 280; The Touraine [1928] Probate 58, 66; Ingram & Royle Ltd. v. Services Maritime, Ltd., L.R.1914, 1 K.B. 541, 551.

■ Indeed, I think that Article V of the schedule of Rules annexed to the Canadian Act which reads as follows (italics mine): "A carrier shall be at liberty to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and liabilities under the Rules contained in any of these Articles, *provided such surrender or increase shall be embodied in the bill of lading issued to the shipper,"* imports the necessity of an explicit provision for a waiver or if not an explicit provision, at least some provision from which a modification of statutory rights and immunities must necessarily be inferred. I do not find either here.

On the contrary, I think—if further authority be necessary—that the statement of Mr. Justice Brandeis in Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, at page 428, 53 S.Ct. 200, at page 201, 77 L.Ed. 403, definitely settles the question of any waiver of the terms of the Canadian statute against cargo's contention. He there said:

"Second. No provision in any bill of lading deprives the vessel owner of the protection given by the fire statute. There are 238 bills of lading on 18 different forms. In no bill of lading is there an express warranty of seaworthiness. In each, there is a provision expressly incorporating the fire statute. Many of the bills of lading contain also this provision: 'It is mutually agreed that * * * the carrier shall not be liable, as carrier or otherwise, for any loss, damage, delay or default, whether occurring during transit or before, * * * occasioned by fire or flood, from any cause or wheresoever occurring * * * by explosion, bursting of boilers, breakage of shafts, of any latent defect in hull, machinery, or appurtenances, or unseaworthiness of the steamer, whether existing at the time of shipment, or at the beginning of the voyage, provided the owners have exercised due diligence to make the steamer sea-worthy. * * *' So far as loss from fire is concerned, the quoted provision leaves the area of personal neglect unchanged, adding nothing to the obligations of the vessel owner. And in view of the express incorporation of the fire statute in the bill of lading, the provision is not to be construed as a waiver of the statutory immunity for loss by fire."

■ D. It follows, and I hold, that under the provisions of the contract of carriage herein the burden was on the cargo to show that the ship was unseaworthy in some specified respect, which caused or contributed to the loss from one of the excepted statutory perils relied on by the shipowner—which in this cause was stranding—an accident of the sea—due to negligent navigation.

### V. A. The Ship and Equipment in general.

Since the Aakre became a Norwegian motor ship, she had had the highest class' in Norwegian Veritas and still had it at the time of the accident. She was surveyed in respect of hull and engine by the Veritas before she left Sandefjord in March 1936, and she has regularly had her classification surveys and passed them.

Before she sailed from Sandefjord, her equipment—lights, anchors, navigation instruments, etc.—were all inspected by the Norwegian Government authorities, and the compasses taken ashore and checked by the Norwegian Government Control Office. The certificates for the compasses, as well as for the rest of her equipment are in evidence as Exhibit A—43 documents in all.

The evidence is uncontradicted that, at sailing from St. John, the hull, hatches, steering gear, navigation instruments, etc., were all in good condition; that the vessel was properly equipped with supplies, provisions, hawsers, spare parts, etc. including spare parts for her Diesel engine. She had charts of the Bay of Fundy, which are in evidence as Exhibits E and F, and all the necessary reference books.

### B. Personnel.

She had a full complement of men, most of whom had been on board a long time. The shipowner had received satisfactory recommendations of the men before they were engaged, and their work had in fact been good.

I find that each of the officers and engineers was a competent and experienced

man. The competency of the officers seems, indeed, to be implicitly conceded.

■ Certainly it is perfectly clear that, leaving the compass question for separate treatment, due diligence had been used to make the Aakre seaworthy, and properly manned, equipped and supplied when she sailed from St. John; and that, as the master testified, she was so in fact.

### C. The Engines

All questions of criticism of the Diesel engine of the Aakre seem to have dropped out of the cause; but, since the petitioner asks for a finding of due diligence with respect to the engines, the evidence should be stated very briefly as follows:

The engines which had been built for the Aakre by Kockums, an engine builder of excellent reputation, were of the M. A. N. type, a well and favorably known design for Diesel engines, used, for example, by the Prince Line, Limited. As already mentioned, they had regularly passed classification surveys, and had always maintained their class. They were in good condition at sailing, and there was plenty of spare parts, and the owners had always supplied every-thing asked for.

Sometime before, especially on one voyage, there had been trouble with breakage of piston bolts, a very common thing on motor vessels, but this had been remedied by installing longer bolts, which had, by reason of their length, more elasticity. No. 5 cylinder, among others, had been equipped with these new bolts. The bolts were tested before sailing on the night of the accident and none broke.

It is quite unnecessary to go into detail about the construction of the engine which has not been involved in the argument. My comment thereon is of the sketchiest nature.

The Aakre sailed from St. John at 9 P. m. on October 28, 1937.

At about 11.45 p. m. her chief engineer reported to her master that a "telescope" pipe—so-called because when in operation it opens and closes like a telescope—which supplied water to cool the No. 5 cylinder of the Diesel engine, had developed a leak.

This accident did not require that the engines should be immediately stopped, but, as weather conditions were good and there was adequate sea room, in the Bay of Fundy to allow the vessel to drift for a while, after conference, the master au-thorized the chief engineer to stop the engines so as to enable the engineering department to substitute a new telescope pipe—a process requiring only a few hours—before going to sea.

The No. 5 telescope pipe, which leaked and was renewed on the night in question, had been installed at Husum, a month before, on or about September 26th and 27th, 1937. It was a new pipe, properly inspected and found in good condition. The second engineer put a gauge on it and found it of full diameter. Its color showed that it had not been used.

At No. 5 cylinder a double pipe, that is, one with two tubes was used. The purpose of the double pipe is to increase flexibility in the event of any slight lack of alignment in the parts. While not so extensively used now as formerly, it is a perfectly proper construction and is, indeed, more expensive than the single tube. The inner pipe is screwed into the outer pipe at the bottom and secured by brazing.

It appears that at times some outer pipes, on which the wear comes, had been renewed, and the corresponding inner pipes, which are not subject to wear, had continued in use. Such work is normally done by a shipyard.

It was not possible to tell definitely whether the outer pipe at No. 5 cylinder had been renewed in that way or whether both pipes were new, but it makes no difference. For it was conceded that renewing the outer pipe only was a proper procedure.

A new No. 5 piston had likewise been installed at Husum, so that both the piston and the telescope pipe were new.

The ordinary life of such a telescope pipe is one to two years and this one had been in use only a month. It had given no trouble. The adjustment of packing made at Montreal on October 20, 1937, was routine work done in preparation for a long voyage.

From examination of the parts it is obvious that the brazing at the juncture between the inner and outer tube gave way, and that the screw threads joining them unscrewed or stripped. All of this may have happened on the night of the accident, or the process may have been under way for sometime.

I find that a defect in the brazing would not be visible from outside, and inspection, short of removing the pipes, would not, therefore, reveal it.

The engines were tested before sailing from St. John and the telescope pipes inspected. There was no leakage. This test was a usual and proper one.

Both Mr. Ford and Mr. Aronsen, experts, considered that the engines were in good and seaworthy condition when the Aakre sailed from St. John so far as due diligence could make them so. Nothing was wrong with the engines when the ship returned to St. John after the stranding.

 It is, therefore, quite clear that the petitioner is at least entitled to a finding of due diligence in respect of the Aakre's engines, and I make such a finding.

Furthermore, the necessity of repairing the engine had not, I find, any causal connection whatever with the stranding.

We may now, therefore, devote our attention, undisturbed by extraneous considerations, to the matters which were so thoroughly and ably argued by counsel for all parties to this cause, and which I have explored with the greatest care in every direction which has suggested itself to me as of possible help in resolving the questions of fact raised herein.

### D. The Compasses.

On March 9, 1936, at Sandefjord, Norway, both the Norwegian Government Board and the Classification Surveyors inspected and approved the standard and steering compasses and certificates of approval were duly issued as to them.

I find that they were of standard and satisfactory type, and that they had good directive force.

The inspection and compensation of the compasses at Sandefjord—on March 9, 1936—were made, just before the ship sailed thence, by a Government adjuster of wide experience. The compensation, which occupied about three and a half hours, is fully described in his testimony.

The deviations of the compasses were reduced practically to a minimum and the adjustment was, in the opinion of the petitioner's experts—who inspired me with more confidence than the experts for cargo —an excellent piece of work. Indeed, there does not seem to have been any real criticism of any value in respect of this compensation, and I find that there was not any evidence from the observations at Sandefjord that there was any lack of balance or stability in the compasses.

I find further, without any hesitation, that the compasses were good compasses and that they were properly adjusted on leaving Sandefjord.

The next matter to consider in connection with the compasses is the fact that the master of the Aakre swung her in the Bay of Fundy on March 24, 1936. He did not then make any adjustments, and, although the swing was perhaps too rapid to give any accurate results, it, at least, gave a general idea of the condition of the standard compass and showed that since Sandefjord there had not been any important change in its deviation on any heading.

I am inclined to agree with Captain Kain, the expert for the petitioner, that on such a rapid swing as was described by the captain of the Aakre—with the ship swinging and the compass card swinging—there would be a tendency to show maximum deviation, and that if the swing had been slowly made the deviations shown would probably have been very much smaller.

The analysis of the swing made by Captain Kain, petitioner's expert, also indicated that there had been very little magnetic change of the ship, and, consequently, in the deviation of the standard compass between the time of the adjustment at Sandefjord on March 9, 1936, and the swing on March 24, 1936.

I agree with Captain Kain and Captain Tvede, petitioner's experts, that there was nothing shown by the performance of the compasses during the swing which would require any further investigation or indicated that further compensation was necessary.

As the swing of March 24, 1936 was a year and a half before the accident, I do not think that it is of controlling importance in this cause, and that I must look at the daily deviation of the standard compass as observed and see whether it showed any substantial errors during the intervening period.

Captain Oyan, who had taken charge of the Aakre in 1935, said that the compasses were very good and there had been little change in them since he had been on the ship.

The Aakre was twelve years old and, consequently, was well settled magnetically.

It does not seem to me that in view of the compass records, the evidence of disparity between the dead reckoning and the observed position in the year and a half preceding the accident would indicate any intrinsic infirmity in the compasses. There

are too many unascertainable variables to consider in connection with such disparities, as, for example, that the vessel may have been poorly steered, that the observations of the officers may have been inaccurate and that the judgment of the master as to current and drift may have been at fault.

The compass book showed under date of September 30, 1937, about a month before the Aakre sailed from St. John on October 28, 1937—the night of the accident—that on a course in the southwest quadrant the deviation of her standard compass would have been an east or plus deviation *not exceeding three degrees*.

Indeed, it might be added that in the log a number of deviations when the vessel was on a course in that quadrant showed that in no case was there any greater deviation than indicated in the September 30th observation which was in the compass book and most easily available to the Aakre's navigator.

Deviations shown by the compass were checked by daily observations whilst the vessel was at sea and, although there may have been gaps in the entries, both in the compass book and the log book, of the deviations found, there does not seem to be any question that there was this daily check, and that, as a result thereof, it was found that the compasses were satisfactory.

Furthermore, the log shows notations of such deviations on the courses in the southwest quadrant taken within a month of the time of sailing on the voyage here in question, except the course south 80 degrees west, on which the last observation was on July 18, 1937.

To summarize, therefore, the log entries indicate that the compasses had never, since adjustment at Sandefjord, been found to vary on the southwest quadrant more than three degrees from the compass card that was there issued.

I believe the testimony of the ship's officers that the deviations noted on the compass card were checked by daily observations, many of which were recorded in the compass book; and I agree with the ship's counsel that the recording of all the identic observations of deviation would not add anything to the information of a person seeking to navigate the Aakre.

The fact that all the observations were not recorded in one book would not necessarily render the vessel unseaworthy provided the observations could be found in the log entries arranged chronologically.

Apart from the general contention of cargo that the compass book itself did not, as it were, focus a sufficient number of entries for the course which the vessel was to pursue from St. John, there does not seem to be any suggestion, which in any way challenges my attention, that the particular deviation information on which her navigator was entitled to rely was either inaccurate or too old.

Three degrees easterly deviation is the highest deviation noted on that course in the history of the vessel from March 1, 1936 to the date of the accident.

■ I, therefore, find that the Aakre's standard compass had a plus or casterly deviation *not exceeding* three degrees on the course on which she left St. John on the night of the accident.

## VI. The Weather

So far as the weather is concerned in the consideration of this cause, I have come to the conclusion that the ship's witnesses were quite right in saying the weather was not foggy *at the ship,* and that the light keepers' evidence that there was not fog *about the lights* at the times indicated in their records, does not even tend to unsettle in my mind the evidence of the ship's witnesses, who, I think, were telling the truth. For it is quite understandable, and I find, that the lights could not be seen from the ship because of patches or streaks of intervening mist and vapor frequently found in the Bay of Fundy, alternating with patches of clear atmosphere. Such a condition was wholly expectable on a night of fog banks impending from the northeast and the southwest which eventually converged and blanketed in fog all that part of the Bay around Grand Manan Island with which we are here concerned.

## VII. The Ship's Witnesses

I saw all the witnesses from the Aakre who were in charge of her navigation on the night in question. They made a most satisfactory impression on me. I think that they were all trying to tell the truth, and, allowing for the inevitable refraction in testimony that occasionally occurs when witnesses speaking a foreign tongue are examined through an interpreter, in whole or in part, as in this cause, I find that the record herein shows the true story of the Aakre's navigation on the night of her stranding as they saw it, and that it is subject to correction, for the reasons

hereinafter given, only in respect of the supposed sighting of Prim Point Light.

I find that the logs were not tampered with and do not represent as cargo's counsel suggest an ex post facto attempt to reconstruct an explanation of the stranding which would exorcise an unknown deviation of the compass from being a contributory cause thereof.

### VIII. The Navigation of the Aakre on the Night of the Stranding

The Aakre sailed from St. John at 9 p. m. on October 28, 1937. At 9:15 p. m. she discharged her pilot and her patent log was put out and, read to the nearest half mile, showed 52 miles. Her course was set 208 degrees by compass [1] which allowed for the westerly variation and, so, with her three degree easterly deviation, for which allowance had not been made, she was set to make good a course of 211 degrees true which, if maintained, would have taken her safely out of the Bay.

On this course the Musquash Light would have been about 5½ miles distant when it bore north northwest ¼ west instead of the 7 miles as estimated by her mate.

At 11:45 p. m. the vessel was stopped for engine repair and at 12 o'clock midnight the patent log was taken in and, read to the nearest half mile, showed 78 miles.

There were not any lights observed by the Aakre's navigators after they lost sight of Musquash, until at 1:45 a. m. a light, supposed to be at Prim Point, was observed bearing southeast by east ½ east. There was not any radio bearing taken at that time, which seems to me one of the first errors of navigation that was committed.

The vessel continued to drift, as hereinafter described in greater detail, from 11:45 p. m. till 2:50 a. m., when the engines were started and the voyage was resumed. The patent log, which had been taken in at midnight, was again put out at 2:50 a. m., and, read to the nearest half mile, still, of course, showed 78 miles.

At 2:25 a. m. a radio bearing was obtained from St. John which showed that the Aakre bore from St. John 216.5 degrees true.

At 3:41 a. m. a second radio bearing was obtained from St. John which showed that the Aakre bore from St. John 218.5 degrees true, and at 3:51 a. m., ten minutes later, a radio bearing was obtained from Yarmouth, Nova Scotia, which was given to the ship as 336 degrees true and which will be discussed hereinafter.

From the time the engines were started at 2:50 a. m. until after the radio bearing from Yarmouth, the Aakre had been steering a course 218 degrees by compass and actually making good, due to her compass deviation, a course of about 221 degrees true. This course had been chosen because the second mate had estimated his position as too far east for safety. For when the first radio bearing was taken, of 216.5 degrees true from St. John, the second mate had laid it out on the *magnetic* rose of his chart which did not allow for any variation, and so involved—as an examination of the chart shows—a mistake which apparently made him bear from St. John slightly more than 21 degrees further to the eastward than his actual bearing therefrom.

He made the same error when he put down the second radio bearing from St. John of 218.5 degrees received at 3:41 a. m., and so he found himself, owing to his error in plotting his position, apparently

[1] Since this opinion was filed counsel have written to me suggesting, in effect, that this mode of describing a course is not nautically conventional. I am quite aware of that. I chose this locution purposely. For after careful consideration of the various approaches to a solution of the facts of this cause, it seemed to me that,—perhaps, especially on account of the form in which the radio bearings were given to the Aakre,—the locution which I have adopted and which is, I think, correct, even if not canonical, gives to the lay mind, at least, the easiest approach to an understanding of the diagnostic problem involved herein, which in its essence, as I see it, is the proper application of the microcosm of the Aakre's compass to the macrocosm of the Bay of Fundy.

Consequently, as the background of my description of all the courses here involved, following the present navy practice—Cf. Bowditch, 1936 Ed. page 16—I have used the full circle, and have forsaken the usual compass card with its necessarily quadrantal implications. For me at least this procedure has made more easily understandable the navigation of the Aakre during the night of the stranding, and has better fixed in my mind, its relationship to the waters in which it occurred.

under the risk of having the Aakre go ashore on the easterly side of the Bay.

That this error in plotting was made, in spite of the cross bearing from Yarmouth, received at 3:51 a. m., is shown not only by the evidence, but, conclusively by the fact that the Aakre's course was changed at 4 a. m. to 249 degrees by compass which would mean that she would make good, owing to her deviation, about 252 degrees true, and at 4:20 a. m. the vessel stranded on Cheney Island. Then, as is hereinafter described, her radio bearings were again taken both from St. John and Yarmouth.

### IX. The Cause of the Stranding

The ultimate question posed for my decision in this cause is:

What was the proximate cause in a legal sense of the Aakre's stranding?

■ I find that the cause of the stranding of the Aakre was entirely due to the error of navigation on the part of the second mate in erroneously laying out the bearing which he had received from St. John.

Owing to the fact that the second mate made his first mistake in his navigation in not getting a cross bearing when he thought that he saw Prim Point Light, he was not aware of how far his drift had taken him to the westward. As I plot it, from his position at 2:50 a. m., he could not have got out safely and cleared the islands and shoals to the west of the Bay unless he steered a course of less than 200 degrees true.

The result was that when the engines of the Aakre were started at 2:50 a. m. and she was put on a course of more than 200 degrees true she was headed for shoals. If she had kept her course 218 degrees by compass, or 221 degrees true, she would probably have stranded somewhere on Whitehead Island or near it.

When at 3:51 a. m. the vessel bore 338 degrees true from Yarmouth, the mate's original error of laying down the St. John bearing on the magnetic rose caused him to believe that he was close to Northwest Ledge. He was in fog. Therefore, to escape what he believed to be immediately impending danger he changed his course sharply at 4 a. m. to 249 degrees by compass, which would mean that he would be making good a course of about 252 degrees true. The Aakre was then close to and headed for the islands and shoals on the easterly side of Grand Manan Island,

and shortly thereafter stranded on Cheney Island.

### X. The Finding of Negligent Navigation Examined in the Light of Certain Established Facts

The reconstruction of past events is always difficult, especially in causes between ship and cargo. The special difficulty involved in such causes is due to the necessarily ex parte nature, so far as cargo is concerned, of everything which happens on shipboard.

Consequently, when there are outside contacts with the ship which can be satisfactorily established, they are most hospitably welcomed by the trier of the facts.

Here we have such contacts. They are the radio bearings which were asked for and received within two hours before and an hour after the stranding, and are confirmed by the testimony of the persons in charge at the shore radio stations on October 29, 1937.

The correctness of these bearings cannot, I think, for reasons hereinafter discussed, be successfully challenged.

Consequently, these are the master facts which constitute the background against which less clearly established or really controversial facts must be examined and tested.

Here we have, in addition to the radio bearings, certain distances measured on the chart and by the patent log, and certain courses given in evidence which I have accepted as correct, from which the distance covered and the course followed by the Aakre whilst she was drifting during the repair of her engines may, I think, be reconstructed with a considerable degree of accuracy.

### A. The Radio Bearings

In my opinion the radio bearings which the Aakre secured from St. John both before and after the stranding clinch in her favor the questions of fact in the cause.

These were three radio bearings from St. John and also two from Yarmouth, Nova Scotia.

The first radio bearing from St. John was secured at 2:25 a. m. and gave the Aakre's position bearing 216.5 degrees true from St. John; the second radio bearing from St. John was secured at 3:41 a. m. and showed that the Aakre then bore 218.5 degrees true from St. John.

At 3:51 a. m., when she was steering 218 degrees and making good about 221 degrees, owing to the easterly deviation of her compass, a cross radio bearing was obtained from Yarmouth, which in effect fixed her position at that time. The mean bearing, according to the log of the radio operator at Yarmouth, was 338 degrees true, and what he calls the "corrected bearing" was 336 degrees true. I have used the mean bearing for reasons hereinafter stated.

The third radio bearing was secured at 4:38 a. m.—after the stranding at 4:20 a. m. This showed that the Aakre bore 220 degrees true from St. John, and this bearing went right through the vessel. A cross bearing also was secured from Yarmouth when she was on the strand; this gave as the mean bearing 334.5 degrees true, and as the "corrected bearing" 332 degrees true.

This mean bearing from Yarmouth of 334.5 degrees true also went through the vessel where she lay on the strand, and so we have a definite radio fix of her position there.

We know that these radio bearings were correct because 220 degrees true from St. John is the bearing on which the points of stranding on Cheney Island actually lies from St. John, and 334.5 degrees true is the bearing said point lies from Yarmouth.

Now, the St. John radio bearing came all the way over the water, and, therefore, would, I am told, tend to be more accurate than a radio bearing coming over both land and water, as did the Yarmouth bearings.

I hold, therefore, that the correct first bearing from Yarmouth ought to be considered to have been the mean bearing of 338 degrees true, and the correct second bearing from Yarmouth ought also to be considered to have been the mean bearing of 334.5 degrees true.

The fact that the third bearing from St. John and the second mean bearing from Yarmouth have been checked and found correct by the actual position of the vessel on the strand, in my opinion, definitely fixes the accuracy of the radio bearings from both places and puts the Aakre throughout her course on the night of the stranding in the westerly half of the Bay.

Her position there is confirmed further by the fact that all of the outside forces acting on her—the northeasterly wind and the current—tended to set her over to that side of the Bay.

Furthermore, as I have found that she had an *easterly* deviation not exceeding 3 degrees, that too was setting her to the westward, although her navigator was not conscious of it, because he had started his navigation without allowing for any deviation.

The result was that the Aakre never got to the eastward of the course on which she started, namely, 208 degrees *true* from the departure buoy.

At 1:45 a. m. when the Aakre was at the place from which she sighted what was supposed to be Prim Point Light, she was at a point in her drift which I calculate, as hereinafter shown, was in fact about 30¼ miles off Prim Point Light, which then bore from the Aakre southeast by east ½ east, or, allowing for about 3 degrees easterly deviation in her compass, about 99 degrees true.

At first I was almost convinced that the navigators of the Aakre had seen Prim Point Light itself, and so had been over in the easterly half of the Bay, but further study of the cause has convinced me that the master was right when he expressed the opinion that the Aakre never sighted Prim Point Light itself, and that the mate, when he counted the flashes with seven second intervals, was in error if he thought that he saw the light itself, and that he must have seen only its reflection.

I find, therefore, definitely that the vessel was never within the ambit of visibility of Prim Point Light itself, although it was about low water at 1:45 a. m. when the light was supposedly sighted, and, as agreed, it would then have been visible for a distance of about 19 miles.

Although the light seen might have been the light of a vessel on the horizon moving up and down in such slight sea as there was at the time, I am more inclined to believe that the mate saw the *reflection* of Prim Point Light because the bearing corresponds with the position of the Aakre, as hereinafter calculated, at the time when the light was supposedly sighted and the light itself could not have been visible from that position.

It is noteworthy also in this connection that Colonel Morrissey, the Marine Agent of the Department of Transport for the Dominion of Canada, who has had charge of all the aids to navigation in the Bay of Fundy for many years, said in his letter of November 22, 1939—now in evidence—

that, although he had not seen the phenomenon himself, "a number of people have told me that they had seen the flashes from Prim Point Light from off St. John, right across the Bay of Fundy, or a distance of over 30 miles."

### B. The Course and Distance of the Drift of the Aakre During the Engine Room Repairs

Having in mind the radio bearings from St. John, above described, which I find are not challengeable, and adding to them certain other almost equally well established facts, I am able to reconstruct to my satisfaction the approximate course of the Aakre whilst she was drifting. For we have the direction and the speed of the current shown by the Current Tables for the Bay of Fundy, Exhibit EE, and the direction and distance of her drift can be estimated with substantial accuracy; and, so, being able to fix with fair accuracy the place where she began to drift at 11:45 p. m., we can also fix with fair accuracy her position when she started up her engines again at 2:50 a. m.

1. In this cause there are certain additional inescapable facts to be borne in mind.

The distance between the departure buoy at St. John and the place of stranding was 44⅛ miles in a straight line.

The patent log was always read to the nearest half mile. When it was put out just above the departure buoy it showed 52 miles. At the time of stranding it showed 91 miles, which indicated a total recorded distance *through the water* of 39 miles.

Since the vessel did not travel in a straight line from the departure buoy to the place of stranding she obviously traveled *over the ground* a greater distance than 44⅛ miles which is the straight line distance between the departure buoy and the place of stranding.

In determining the difference between the distance *through the water* and the distance *over the ground,* it must be remembered that the vessel's engines were stopped at 11:45 p. m., and that the patent log was not in operation from 12 midnight until 2:50 a. m., that is, for two hours and fifty minutes.

At 12 midnight, fifteen minutes after the Aakre's engines were stopped and presumably after her way had been lost—for the patent log was then taken in—the patent log, read to the nearest half mile, showed 78 miles, which indicated a distance traveled *through the water* from the departure buoy of 26 miles.

The Aakre at 11:45 p. m. had been traveling at full speed of circa 11 knots since 9:15 p. m., or for two and a half hours—although the patent log was registering for an additional fifteen minutes longer whilst her way was being lost. The Current Tables for the Bay of Fundy show that the current in the waters which the Aakre was then traversing ran 1.4 knots in a west southwesterly direction on the ebb tide. Accordingly, I think that the vessel had at 11:45 p. m. traveled *over the ground* 30 miles.

The Aakre's position at 11:45 p. m.— the time when her engines were stopped— would, therefore, be approximately 30 miles from the departure buoy at a point a little to the westerly of a compass course of 208 degrees from the departure buoy. The westerly distance from that course cannot be exactly determined, but can be determined with a fair degree of accuracy because, owing to the three degree easterly deviation of her compass, the wind and the set of the current, her course made good would have been about 211 degrees true.

2. It is important to know as nearly as may be where the Aakre's position was when her engines were started again at 2:50 a. m.

This position can be calculated with fair accuracy by tracing back from the point of stranding the vessel's course as shown in the log at the speeds shown therein.

It is obvious that in thus working backwards, the backward course will, as the actual course did, intersect with lines drawn to indicate the radio bearings secured from St. John. Such lines as they reached further from their centre at the St. John radio station spread gradually apart, so that when at 4 a. m. the Aakre changed her course to 249 degrees by compass, this spread between two points equi-distant from St. John on the bearings 216.5 degrees true from St. John and 218.5 degrees true from St. John would—as nearly as can be measured on the chart—be about a mile and three quarters; and the spread between two points equi-distant from St. John on the bearing 218.5 degrees true from St. John and on the bearing of 220 degrees true from St. John—the true bearing therefrom of the place of stranding—would be, as nearly as can be measured on the chart, about a mile and a quarter.

Furthermore, on the course of 218 degrees by compass or 221 degrees true on which she had been running from 2:50 a. m.—when her engines were started after the repairs—to 4 a. m. when her course was changed to 249 degrees by compass—which meant that she would make good 252 degrees true—she had been running diagonally between a bearing of 216.5 degrees true from St. John and a bearing of 218.5 degrees true therefrom, and, whilst she was making good that course, I estimate that her distance made good to the westward was about one mile.

It is noteworthy, as a check of this estimate, that the Aakre's position at 3:41 a. m., when she got the radio bearing of 218.5 degrees true from St. John, also establishes that, during said period, she had travelled to the westward almost one mile.

In tracing the Aakre's course backwards, I will, for convenience of statement only, disregard the 3 degrees deviation which I find the Aakre had, and which, as is shown above, was only one of the factors in giving her a westerly drift of about a mile in an hour and ten minues—from 2:50 a. m. to 4 a. m.

So designated the Aakre's back courses were; first, a course of 69 degrees—the opposite of 249 degrees—on which course she was when she was stranded and had been for twenty minutes prior thereto, and second, a course of 38 degrees—the opposite of 218 degrees—which course she held from 2:50 a. m. to 4 a. m., — one hour and ten minutes.

The Aakre's courses thus traced back would lead to her approximate position when she started her engines at 2:50 a. m.

3. But where that approximate position would be, would depend, of course, on the Aakre's speed *over the ground,* which I have been estimating as about 11 miles per hour, if full speed were maintained.

For the twenty minutes from 4 a. m. to the stranding at 4:20 a. m., the Aakre's back course, as above indicated, was 69 degrees —the opposite of 249 degrees.

Owing to the fact, however, that because of fog during this period the engines were run at half speed and slow, the distance back to her change of course at 4 a. m. is difficult to calculate accurately on speed alone, but, if we remember that the distance at 4 a. m. between two points equi-distant from St. John on a bearing from St. John of 218.5 degrees true and on such a bearing of 220 degrees true would be about a mile and a quarter, the distance traversed in the last 20 minutes before the stranding can be fairly estimated at about three miles, because that course went curving slightly to westward diagonally between the two lines indicating those two bearings, and so exhibited hypotenusal characteristics towards said lines.

From 4 a. m. to 2:50 a. m., the Aakre's back course would be 38 degrees—which is the opposite of 218 degrees. In this period of an hour and ten minutes, assuming that her speed was circa eleven miles an hour, she would, if full speed could have been maintained, have gone about 11⅙ miles; but, because of the flood tide then running against her and the necessity of slowing down for fog, full speed could not be maintained throughout this period, and, as I calculate it, on this course she covered only a little more than eight miles *over the ground.*

This brings the Aakre back approximately to the place where her engines were started up again at 2:50 a. m. and the lacuna in her navigation due to engine repairs ended.

The distance *over the ground* thus traced back on the Aakre's courses from the stranding to the place where her engines were started up at 2:50 a. m. amounts altogether—according to my calculations—to slightly more than eleven miles.

The patent log from the time of starting up the engines to the time of stranding showed thirteen miles. This discrepancy of less than two miles between my calculations and the log can be easily accounted for, first, by the fact that the tide had changed and was against the Aakre and, consequently, her patent log would be speeded up and tend to register more than her distance *over the ground,* and, second, because, as above mentioned, the patent log is only read to the nearest half mile.

4. As I have calculated it, between 11:45 p. m., when the Aakre stopped her engines —though by momentum maintaining her course for circa fifteen minutes longer— and 2:50 a. m. when I find she started up her engines after their repair, she drifted, principally due to the current, in a west southwesterly direction for about five miles.

The distance and direction of this drift I work out thus:

According to the Current Tables for the Bay of Fundy, Exhibit EE, the current at

the time in question was running west southwest 1.4 knots.

We know that at 1:45 a. m. Prim Point Light was supposed to have been seen bearing southeast by east ½ east—about 99 degrees true. This established that the vessel must have drifted west southwest circa 3⅞ miles during the period of two hours between 11:45 p. m. and 1:45 a. m.

We also know that at 2:25 a. m. St. John's radio station bore from the Aakre 36.5 degrees true—which is the opposite of 216.5 degrees true. This establishes that in the forty minutes between 1:45 a. m. and 2:25 a. m. the vessel had drifted west southwest circa ¾ of a mile.

As I have calculated it, the Aakre's position due to her drift at 2:50 a. m.—after twenty-five minutes more had elapsed—was west southwest about ⅜ of a mile from the vessel's position at 2:25 a. m.

By adding these distances I find a drift of about five miles, and I show that the total distance which the Aakre went *over the ground* from St. John to the point of stranding to have been 46⅞ miles.

Subtracting the estimated five miles which the vessel drifted whilst her engines were not in operation, the distance *over the ground* covered by the Aakre, while the patent log was recording, was 41⅞ miles. The discrepancy of 2⅞ miles between the recorded patent log distance of 39 miles and the actual distance of 41⅞ miles may be, I think, fairly accounted for by the facts, first, that, whilst the Aakre was running with the ebb tide from 9:15 p. m. to 11:45 p. m., when her engines were stopped, the registration of her patent log —which only records distance through the water—would tend to be *less than her distance over the ground,* and, second, as above observed, that her patent log is read to the nearest half mile only.

To summarize:

We know, for the reasons above given, the Aakre's approximate position at 11:45 p. m. when her engines were stopped.

The foregoing reconstruction of her course and the distance which she covered *over the ground* between 11:45 p. m. and 2:50 a. m., whilst she was drifting, places her, as above shown, in approximately the position at 2:50 a. m. in which her courses *traced backwards* place her at that time.

Furthermore, the bearing of the reflection of Prim Point Light from the Aakre at 1:45 a. m. and the Aakre's radio bearings from St. John, secured at 2:25 a. m., tend strongly to confirm the correctness of my calculations, both with regard to the course and distance of her drifting, and with regard to the total distance which she traveled *over the ground* from St. John to the point of her stranding on Cheney Island.

Consequently, I find that the navigation of the Aakre on the night of the stranding is thus satisfactorily established beyond any reasonable doubt, and that the theories thereof advanced on behalf of cargo are wholly unsustainable.

### XI. The Norwegian Statutes

Accordingly, due to my study of the facts as explained above in this opinion, I hold that the stranding of the Aakre was exclusively due to errors of navigation in the respects above described, and that her stranding not only was not caused or contributed to by any unknown deviation in her compass or any failure, of which her navigators may have been guilty, to record all her compass deviations in her compass book, but, under the facts here shown, could not have been caused thereby.

The cargo relies on the provisions of the Norwegian Merchant Shipping Act of July 20, 1893, the Norwegian Statute of Government Control of Seaworthiness of Ships of June 9, 1903, Sections 49 and 50, and the amendments thereof of July 6, 1938, and the Rules promulgated by Royal decree in pursuance of said Acts, as showing that by reason of failure adequately to record her compass deviations in her compass book, the navigators of the Aakre were guilty of a statutory fault. This fact cargo claims brings the Aakre within the rule requiring a person who is guilty of a statutory fault to show not only that his fault *did not cause the accident,* liability for which he seeks to escape, but also that it *could not have caused it.* The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, and the many other cases which have followed in its wake.

I think it is unnecessary for me to discuss or decide the juridical status before this Court in this cause of the Norwegian Statutes relied on by cargo. Because, even if they have the effect on the burden of proof for which cargo contends, and make the so-called Pennsylvania rule applicable, this is one of the rare cases in which the shipowner has sustained the heavy burden of proof laid on it by that rule, and has shown that, if there was any breach of said Norwegian Statutes or Rules, such breach

not only did not but could not, under the facts here shown, have caused or contributed to the Aakre's stranding.

## XII. The Chart

██ Counsel for the cargo contends that as the master and navigator of the Aakre were using a British Chart—No. 352, which is marked as Exhibit E—from the time they took their departure from the Fairway or Black Point Buoy until the vessel stranded, and that as this chart had the buoy located in a position where it had been prior to September 1931, but whence it had then been moved northerly about 2½ miles, the Aakre's stranding must be attributed to the fact that this chart was used in her navigation; and, by hypothesis, that when she sailed from St. John she must have been unseaworthy because the chart had not been corrected.

The Aakre had on board in "Lights and Tides of the World" the necessary information to correct the position of the buoy on the chart, and also had on board a British Admiralty Chart, Exhibit F—Sheet No. 2 for the Bay of Fundy—corrected from the Canadian Government Chart of 1931, which showed the buoy in its correct position.

The captain knew that the position of the buoy had been changed from the place where it was shown on his chart, and knew what its new position was. There is not, therefore, any element of ignorance of the situation involved, and I hold that the vessel was not unseaworthy in respect of her charts.

If any criticism be involved it is that this was an instance of negligent navigation for the captain not to correct the chart when he knew that it should be corrected and had the necessary data on board from which to make the correction.

██ But whether the Aakre was unseaworthy in respect of this chart or not, it was a form of unseaworthiness that did not cause or in any way contribute to her stranding, because her navigation before her engines were stopped for repairs, and after her engines were started again, are two entirely separate chapters in her story, divided both chronologically and causally by the period of her drifting described above.

The second chapter did not in any way depend on the first, but involved a basic error in navigation because the second mate had so wrongly laid off his radio bearing from St. John as to make him think the Aakre was bearing therefrom 21 degrees east of her actual position.

The courses on which the Aakre ran after her engines were started, and after the mate had thus wrongly laid off the radio bearing from St. John, therefore, were entirely independent of any course which she had followed prior to that time.

I have already found in favor of the competency of the Aakre's officers, but as everyone knows it is impossible to say when a competent man may perform some unexpectably negligent act, and an unexpectably negligent act occurred in this cause when the navigator of the Aakre wrongfully laid off his radio bearings from St. John.

I, therefore, hold that the point which the cargo makes about the chart cannot be supported, and it seems to me that in this cause it is shown beyond peradventure that the error in navigation, above discussed, was, as I have held, the exclusive cause of the Aakre's stranding.

## XIII. Costs and Disbursements

██ The petitioner will have its costs both on the granting of the petition for exoneration and on the dismissal of the libel, but it may, of course, only tax disbursements in one proceeding.

██ Lamport was an original respondent to the libel and, therefore, on dismissal is entitled to have a bill of costs and its taxable disbursements.

██ Continental, which was brought into the libel by Lamport, is entitled to its costs and taxable disbursements for which the libelants will be primarily, and Lamport only secondarily liable.

I will not give any costs or disbursements in respect of the petitions by which Continental impleaded Lamport and by which Lamport and Continental both impleaded the shipowner in the original libel, nor any costs or disbursements to the owner of the Aakre who as her claimant and as respondent to the libel cross-impleaded both Lamport and Continental therein.

This disposition of the costs I believe will enable each successful party to get the costs and taxable disbursements to which it may properly be entitled.

██ XIV. Fortunately both for counsel and for the Court this is a cause in admiralty and so it is not governed by Rule 52(a) of the Rules of Civil Procedure, 28

U.S.C.A. following section 723c, as to findings of fact and conclusions of law.

Consequently this opinion may stand as the findings of fact and conclusions of law in this cause required under Admiralty Rule 46½, 281 U.S. 773, Title 28 U.S.C.A. following Section 723, and I will sign an order so providing. The El Sol, D.C., 45 F.2d 852, 856, 857; Southern Pacific Co. v. United States, 2 Cir., 72 F.2d 212; and cf. Hazeltine Corporation v. Radio Corporation, D.C., 52 F.2d 504, 512; Lewys v. O'Neill, D.C., 49 F.2d 603, 618; Briggs v. United States, 6 Cir., 45 F.2d 479, 480; Stelos Co. v. Hosiery Motor-Mend Corp., D.C., 60 F.2d 1009, 1013; Id., 2 Cir., 72 F. 2d 405; Id. 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414.

The order to this effect may be embodied in the final decree exonerating the petitioner and in the final decree dismissing the libel.

The decrees unless agreed as to form will be settled on the usual notice.