## McALLISTER BROS., Inc., v. PENNSYLVANIA R. CO.

### No. 186.

Circuit Court of Appeals, Second Circuit.

March 3, 1941.

Edmund F. Lamb, of New York City (Purdy & Lamb, of New York City, on the brief), for libelant-appellee.

Chauncey I. Clark, of New York City (Burlingham, Veeder, Clark & Hupper and Frederic Conger, all of New York City, on the brief), for respondent-appellant.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This libel is brought by McAllister Bros., Inc., to recover for damage to its barge "McAllister No. 69," sustained in New York harbor during the storm of the afternoon of September 21, 1938. The district court found that respondent, the Pennsylvania Railroad Company, which had taken the barge on charter that morning, was negligent in its care of the vessel. The only question on this appeal is the sufficiency of the evidence to support the findings on which that conclusion was based. Though the appeal brings the issues before us de novo, yet the well settled rule is that the court's findings must stand unless they are clearly against the preponderance of the evidence. City of Cleveland v. McIver, 6 Cir., 109 F.2d 69; The A. G. Brower, 2 Cir., 220 F. 648; The City of Augusta, 1 Cir., 80 F. 297.

Early in the morning of the day in question the respondent placed the "No. 69," loaded with about 40 tons of steel, on the northwest side, and about 60 feet from the end, of Pier 46. There, beginning sometime before 1:00 P. M., eastern standard time, she was battered against the pier by the high wind and seas, and developed a strong list to port before she was removed, about 5:00 or 5:10 P. M., by libelant's tug "William H. McAllister" into nearby Erie Basin. Immediate efforts to siphon her out failed, and she quickly settled onto her port side, becoming almost entirely submerged. This libel followed.

For its defense, respondent relies largely on the unprecedented severity of the storm of that day, which, as is well known, did so much damage throughout New England. So unexpected was the storm, in the respondent's view, that it could not reasonably have foreseen that Pier 46 would not be a safe berth and that the "No. 69" should be moved, until a time near the height of the storm when no tugs were available for the purpose and none could have safely undertaken it if they had been.

Disregarding all other facts which the court thought should have brought the danger to respondent's attention, we do not feel justified in rejecting the finding that respondent received at 11:00 A. M. the full text of a Weather Bureau warning of the storm. The Bureau in New York received the warning at 10:40 A. M. and, following customary procedure, immediately telephoned it to a list of local shipping interests, on which respondent stood second. The warning stated that a tropical storm 75 miles east of Cape Hatteras was "moving rapidly north-northeastward attended by shifting gales over a wide area and by winds of hurricane force near center. Northeast or north gales backing to northwest south of Block Island to Hatteras today and southeast or east gales Block Island to Eastport becoming northwest tonight or Thursday morning. Small craft

should remain in port until storm passes." Respondent claimed that the warning it received did not contain the intermediate sentence, but its evidence thereon was unconvincing.

In answer to the direct question whether or not the position of the "No. 69" at Pier 46 was a "safe berth for a barge in a heavy northwest wind," three masters not connected with the libelant and Harry Garcia, superintendent of Pier 46, as well as two of libelant's masters, answered in the negative. This was certainly not an unreasonable opinion. Pier 46 extends from the Brooklyn shore to the southeast a distance of nearly 500 feet from the bulkhead. The barge lay in the outermost berth, within 60 feet of the pier's end. Though Pier 45, on its northwest, extends farther into the harbor, it, like Pier 46, is a spile pier and is open except for a shed extending only 80 feet from the bulkhead. Pier 44, farther to the northwest, is considerably shorter than Pier 46. But to the southeast next to Pier 46 is the pier of Beard's Erie Basin Stores, which is much longer, is filled in, and carries a superstructure to its end. Thus it is apparent not only that the end of Pier 46 is broadside to northwest winds and seas and unprotected against them, but that the Beard pier would serve to throw heavy waves back against it. That the "No. 69" was lightly loaded at the time would not lessen the potential danger. The inference fairly to be drawn from this situation, and the corroborating opinion of libelant's expert witnesses, is substantiated by the fact that the "No. 69" actually did suffer damage prior to 1:00 P. M., more than two hours before the storm reached its greatest intensity.

If respondent should have known that the "No. 69" in its position at Pier 46 would be unsafe in a "heavy northwest wind," the warning at 11:00 A. M. of "shifting gales," "winds of hurricane force," and "north gales backing to northwest * * * today" should have moved it to reasonably prompt action. This is enough to settle the case, for it is not really disputed that tugs were available beween 11:00 A. M. and 1:00 P. M., and that removal of the "No. 69" could then have been accomplished without risk.

Moreover, at or before 1:00 P. M., the Weather Bureau conveyed a second specific warning predicting a greater intensity of a wind already at 50 m. p. h. and a shift from north to northwest. And Garcia about the same time telephoned respondent's tug dispatcher to advise of the damage already done to the barge and to request that a tug be sent to remove it into Erie Basin. The court found that the "No. 69" could have been safely removed as late as 2:30 P. M. and "probably" as late as 3:30 P. M. At the latter time the wind had definitely shifted to the northwest, was at 70 m. p. h., and would have swept broadside across any tug going directly into the slip. Nevertheless, four masters, two of them not connected with the libelant, thought it practicable to move the barge up to that time, if not at any time during the storm. We do not think we should reject this expert opinion which the court found credible; in any event, time for rescue was clearly available after the definite warnings were received.

The court found that during this period several of respondent's tugs, as well as several outside tugs, were available for rescue purposes. Respondent asserts that they were engaged in other errands of mercy. Even so, moving the barge a few hundred feet would not have taken long—five minutes according to one witness—and whatever were the obligations of the other tugs, as to which there was considerable dispute, the court seems justified in concluding that this brief task could have been accomplished without substantial difficulty had respondent had the will to do it. Moreover, libelant's own tug "William H. McAllister" lay at Pier 43, North River, awaiting orders from 2:40 to 3:40 P. M. until libelant's vice-president, eventually called by Garcia when respondent failed to act, sent it to "No. 69's" aid. (Its delay in rescue until 5:00, when it was too late, was due to a ten-minute repair job on a sprung bunker plate, plus the time spent in retrieving a drifting barge; but that appears to have been another story.) Prompt notice by respondent to libelant of the plight of the barge would have given the "William H. McAllister" opportunity to save it.

The evidence was thus conflicting and not altogether easy of appraisal. Justice would be little advanced were we to substitute our conclusions of fact for those of the judge who saw and heard the witnesses. We content ourselves by saying that there was adequate evidence to support the finding of negligence upon the part of respondent in its failure to act both before and after the message from Garcia at 1:00 P. M.

Affirmed.