THE AAKRE.

WATERMAN et al. v. THE AAKRE et al.

No. 344.

Circuit Court of Appeals, Second Circuit.

July 28, 1941.

Writ of Certiorari Denied Dec. 8, 1941.

See —— U.S. ——, 62 S.Ct. 360, 86 L.Ed. ——.

FRANK, Circuit Judge, dissenting.

———◆———

D. Roger Englar, of New York City (Bigham, Englar, Jones & Houston, W. J. Nunnally, Jr., and F. Herbert Prem, all of New York City, on the brief), for libellants-claimants-appellants.

John W. Griffin, of New York City (Haight, Griffin, Deming & Gardner, Wharton Poor, and James McKown, Jr., all of New York City, on the brief), for Rederi A/S Henneseid.

John L. Galey, of New York City (Burlingham, Veeder, Clark & Hupper and Burton H. White, all of New York City, on the brief), for Lamport & Holt Line, Ltd.

George C. Sprague, of New York City (Crawford & Sprague and H. C. Archibald, all of New York City, on the brief), for Continental Grain Co.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This proceeding arose out of the stranding of the Aakre, a Norwegian motor vessel of 4,138 tons gross and 2,336 tons net, on Cheney Island near Grand Manan Island in the Bay of Fundy on the morning of October 29, 1937. Much of the cargo of potatoes then on board was jettisoned, and most of the remainder was lost through delay and rehandling.

The cargo was carried under bills incorporating the Canadian Water Carriage of Goods Act, 1936, which in all material respects is identical with our own Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315. By Art. IV, sub. 1, of the Schedule of Rules of the Canadian Act, "Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped and supplied"; and by sub. 2, "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from (a) act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship: * * * (c) perils, danger, and accidents of the sea or other navigable waters."

The trial court found that the stranding was not caused by unseaworthiness, but by an error in navigation. It consequently rendered a decree exonerating ship and carriers from liability, and dismissing the cargo owners' libel. From this decree the latter appeals.

The Aakre sailed from St. John at 9:00 P. M., October 28, 1937, intending to traverse the Bay and leave it by way of the gap between Old Proprietor Shoal and Northwest Ledge. The distance from St. John to the gap is about 50 miles, and the width of the gap about 15 miles. The vessel first made good from St. John a course about 211° true, which, if continued, would have carried her just east of Old Proprietor Shoal and safely out of the Bay.

When she had proceeded on this course about 26 miles through the water—an estimated 30 miles over the ground—a leak developed from a latent defect in a "telescope pipe," and the engines were stopped at 11:45 P. M. to permit repairs. The court found, by tracing her course back from the point of stranding, that her drift between 11:45 P. M. and 2:50 A. M., when the engines were again started, was about four miles almost due west, placing her where a new course more southerly than the old would be necessary to pass to the east of Old Proprietor Shoal. Instead, she steered further to the west. From 2:50 A. M. until 4:00 A. M., she ran 221° true, toward the mass of shoals and islands behind Old Proprietor. At 4:00 A. M., she shifted her course still further west to 252° true; and at 4:20 A. M., she ran aground on Cheney Island, about 44 miles from St. John.

The strange courses steered from 2:50 until 4:00 A. M., and from 4:00 until 4:20 A. M., are explained by the captain's complete misunderstanding of his position. His dead reckoning until the engines were stopped at 11:45 P. M. was at least roughly accurate, although it probably did not allow for the effects of favorable currents on his speed over the ground. At about 1:45 A. M., however, the third officer saw to the east what he believed to be Prim Point Light, which was actually invisible from the position of the ship at the time, and from anywhere except well to the east of her dead-reckoned midnight position. Surprised at this, the captain called on the second officer for a radio bearing, which the latter took from St. John at 2:25 A. M., found to be 216.5° true, but erroneously transcribed on the chart as about 195° true from St. John. By this error the apparent position of the vessel was shown to be far east of its actual position, and the third officer's mistaken report of having sighted Prim Point Light was confirmed. Hence the captain believed that he was east, instead of west, of his original course, and set the new 2:50 A. M. course accordingly.

A second radio bearing from St. John taken at 3:41 A. M. showed the vessel at 218.5° true; but another error was made, and this bearing was transcribed onto the chart as about 197° true from St. John. Both errors were of 21°, the amount of

local variation,[1] and may have been made by marking the chart with reference to the inner or magnetic, rather than the outer or true, rose. When the second St. John bearing was crossed immediately by a correct bearing from Yarmouth, Nova Scotia, the captain was led to believe that he was still to the east of his course and then dangerously near Northwest Ledge. Meaning to avoid this, he veered more sharply westward at 4:00 A. M. and directly onto Cheney Island.

It is entirely futile for appellants to question that such apparently simple mistakes of navigation could have been made. The three stated radio bearings were certainly taken, and the ship's course was certainly laid as described. No other explanation of that course, except the complete uselessness of the compasses, can be imagined. Appellants do not suggest this, or any alternative explanation. The compasses were shown to be accurate and reliable, the court found that they were, and appellants have not even made out a serious case to the contrary.

The two charges of unseaworthiness which appellants make against the Aakre are that it used an inaccurate chart of the Bay, and that it lacked proper compass records.

The gist of the first of these charges is that the Aakre was using an old chart which showed the Fairway Buoy outside St. John Harbor to be 2½ miles south by east of its position at that time, and that by taking the buoy as a point of departure she steered a course somewhat west of what she intended.

■■ The vessel had aboard, however, another chart and a catalogue of lights and buoys by which the error might have been corrected, and the captain was personally aware of the error. Under such circumstances, a failure to make the necessary routine correction was possibly bad navigation, but was certainly not a deficiency in the vessel's equipment. United States Steel Products Co. v. American & Foreign Ins. Co., 2 Cir., 82 F.2d 752; cf. The W. W. Bruce, 2 Cir., 94 F.2d 834, certiorari denied, Pacific-Atlantic Steamship Co. v. Weyerhaeuser Timber Co., 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533. Although the first mate originally was misled by the erroneous chart, the captain noticed the error and corrected it before midnight. Moreover, navigation after the period of drifting was from a new point of departure, and completely detached from navigation before that period. Even if the course reckoned from the erroneous chart had gone uncorrected, it could never have thrown the vessel more than a negligible distance to the west of its reckoned course, for the east-west difference in the actual and indicated position of the buoy was very slight. Consequently, unseaworthiness with respect to the chart, if it had existed, could not have contributed to the accident.

■ The second charge of unseaworthiness was directed at the alleged deficiency in the compass book of entries on compass deviations.[2] The vessel carried deviation records in three different forms: (1) The compass card, kept on the bridge, showing the deviations at each compass interval of ten degrees, as found by a government adjuster at Sandefjord, Norway, on March 9, 1936; (2) the compass book, also kept on the bridge, showing 103 deviation entries made since the Sandefjord adjustment, and also catalogued under compass intervals; (3) the logbooks, showing many more entries, but not catalogued except in the chronological order in which they were taken. Appellants argue that logbook entries are practically useless because not easily accessible, and that good practice requires daily observations and regular entries in the compass book, at least of all observations showing as much as one degree's difference from the last recorded observation in the same sector. With this, all the expert witnesses and the court itself seemed to agree; and it is evident that the compass book lacked a record of some observations which it would have had if the practice had been strictly observed.

The court found, however, that adequate observations had been made, and, from the logbook entries, that the deviation in the south-west quadrant had never been greater than three degrees. Of this maximum de-

---

[1] "Variation" is the difference in degrees between the direction of the true pole and the magnetic pole: It is comparatively fixed for any one locality, but is not the same in different localities.

[2] "Deviation" is the difference in degrees between the direction of the magnetic pole and the compass needle. As parts of a ship will influence a magnetic needle, its susceptibility must be ascertained and recorded for every course which the ship might make. Deviation may also be affected by repairs, age of the vessel, and cargo.

viation the navigator was apprised by an entry in the compass book September 30, 1937, showing a plus three-degree deviation on a course S 50° W; and if the navigator failed to make proper allowance for it the night of the accident, his error could not be attributed to lack of information. Since the compass book carried the particular entry necessary for this occasion, even a fairly general deficiency in the records could not have been material to the stranding. Furthermore, it is a sufficient answer to this charge, as to the former, that no possible error in the ship's course before the period of drifting could have affected her navigation afterwards, and that three degrees' difference in her course after 2:45 A. M. would not have saved her from the effects of the captain's misconception of his position.

Since we recognize that the compass book did not contain all the entries which good seamanship required, nothing is added to the argument by the proof of a Norwegian statute enjoining regular entries in the compass book. The materiality of its violation is disproved in exactly the same fashion, and as we have just stated.

Appellants' chief argument, however, is not that a deficiency of the compass records (necessarily entailing a violation of Norwegian law) was directly responsible for the catastrophic navigation of the Aakre. Arguendo, at least, they assume that the careless transcription of the St. John radio bearings was directly to blame. But, they contend, the positions at which those bearings put the ship were so far removed from her actual and dead-reckoned position that they could have been accepted unquestioningly only by one who lacked faith in his dead reckoning, and therefore in his compass data.

This argument puts directly into issue the captain's state of mind—his belief in the accuracy of the compass and the sufficiency of the compass data, as well as the fact of the accuracy of the one and the sufficiency of the other. The captain himself testified that the Aakre's compass was the best he had ever used, and that the compass data were "sufficient for safe navigation"; and the trial court accepted this testimony not only as true in fact, but also as a true statement of what the captain had always believed. This is a complete answer unless other facts are shown which make the captain's faith absolutely incredible.

The captain explained that he thought his apparent change in position at 2:25 A. M. was owing to currents, on which the vessel had been adrift almost three hours. Actually, his drift was a little south of west, while his supposed drift was a little east of south—a difference in direction of about 90°. The Aakre had aboard information on the direction of currents in the Bay, but the captain did not examine it. He knew the Bay had a reputation for changeable and uncertain currents. His course from 4:00 to 4:20 A. M. conclusively demonstrates that he believed he had run since 2:50 A. M. almost 10 knots faster than the engine speed, although the current was actually not more than 2 knots, and at that time in the opposite direction. If he made any attempt at all to reconcile his supposed 2:50 and 4:00 A. M. positions, he must have thought the Bay currents entirely unpredictable in force and direction; or possibly he knew nothing about them.[3] This is perhaps very bad navigation, but is no reflection at all on the quality of the ship's equipment.

On the contrary, it has already been stated that the compass was shown to be highly accurate, and the compass book was shown to conform to ordinary requirements, at least in respect of the south-west quadrant. In other quadrants it was not radically deficient. Appellants recite at great length a list taken from the Aakre's logbook of discrepancies between dead-reckoned and observed positions on previous voyages as evidence of inaccurate navigation. Most such discrepancies are no greater than are reasonably to be explained by the incalculable effects of tide, currents, and wind. To some extent they might be attributable to poor steering or inaccurate observation. But the greatest

---

[3] That he did not know the currents or try to determine their nature is borne out by his explanation of why he allowed on his chart for a slight drift between 2:25 and 2:50 A. M. in a south-by-west direction. He said that he "just assumed it." It is true that his assumption of a south-by-west current is inconsistent with the belief that he drifted from his dead-reckoned midnight position to his supposed 2:25 A. M. position on a south-by-east current. But on the trial there was no attempt to elicit a rationalization, of which he may have had several; and the matter, therefore, stood on his quite erroneous assumption.

discrepancies shown are all largely along the line of the ship's course, not transverse to it, and to that extent not relevant to the performance or reading of the compass. Appellants' reference to two previous occasions on which the Aakre stranded can have little probative effect without more particular evidence of the causes. It affirmatively appears that on at least one of these occasions the Aakre was navigating in narrow Norwegian coastal waters, through strong currents, in a snow storm and a hurricane. Such circumstances as those would certainly support no inference of unseaworthiness.

Much argument has been devoted to the rule in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, which declares it to be incumbent upon a vessel shown to have been guilty of violating a statutory rule of navigation to prove that the violation *could not* have contributed to the ensuing collision. Appellants contend that it is applicable to strandings as well as to collisions, The Denali, 9 Cir., 105 F.2d 413, on rehearing 9 Cir., 112 F.2d 952, certiorari denied, Alaska Steamship Co. v. Pacific Coast Coal Co., 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. ——, and, being a rule of evidence, to proceedings under foreign as well as under domestic law. See Richelieu & Ontario Nav. Co. v. Boston Marine Ins. Co., 136 U.S. 408, 422, 423, 10 S.Ct. 934, 34 L. Ed. 398. Finally, the burden cast upon the vessel is said to be something more than a burden of disproving a causal relationship.

■ The problems, in so far as they need affect this case, are easily settled. If The Pennsylvania rule prescribes anything more than a shift in the burden of proof with regard to the causal relation of default to injury—if it is an absolute penalty for default—it is much more than a rule of evidence or procedure. It then requires the establishment of facts not otherwise a part of the cause of action, and clearly affects the substantive rights of the parties. In that event, it is not applicable to a cause triable under foreign law. On the other hand, if it does no more than shift the burden of proof, the vessel has met that burden in this case by credible evidence on every point at issue.

■ Indeed, however The Pennsylvania rule was originally stated, the history of its application shows that it has done no more than shift the burden of proof with regard to causality. That was all that was necessary to the decision of The Pennsylvania case itself, to the Richelieu case, supra, and to The Martello, 153 U.S. 64, 74, 14 S.Ct. 723, 38 L.Ed. 637, and Lie v. San Francisco & P. S. S. Co., 243 U.S. 291, 298, 37 S.Ct. 270, 61 L.Ed. 726. It seems to have been disregarded altogether in White Oak Transportation Co. v. Boston, Cape Cod & New York Canal Co., 258 U.S. 341, 344, 42 S.Ct. 338, 66 L.Ed. 649, and was assumed to have done no more than shift the burden in Henry DuBois Sons Co. v. A/S Ivarans Rederi, 2 Cir., 116 F.2d 492, certiorari denied The Ariosa v. A/S Ivarans Rederi, 61 S.Ct. 942, 85 L.Ed. ——.[4] Still, if it were applied in the strongest sense conceivable, requiring the defaulting vessel to show that the inference of non sequitur was not only the most probable, but even the only possible, inference from the facts in evidence, appellants still could not succeed; for every point at issue in the case, including the captain's faith in his compass, was established by direct testimony.

■ The questions involved in this proceeding were questions of fact which the court below resolved in an opinion which demonstrates the care and consideration which he gave to the matter. D.C.S. D.N.Y., 31 F.Supp. 8-23. In view of this, criticisms made of it that he was confused as to the navigator of the ship, because he did not always distinguish between the master and the second mate, seem rather captious. His material findings are clear and definite. We have recently emphasized that admiralty findings should be accepted on appeal unless clearly erroneous. United States Gypsum Co. v. Conners Marine Co., 2 Cir., 119 F.2d 689; Johnson v. Andrus, 2 Cir., 119 F.2d 287; McAllister Bros. v. Pennsylvania R. Co., 2 Cir., 118 F.2d 45. Here they seem quite the most natural and rational under the circumstances; indeed, cargo's real complaint is with the policy of Canada and ourselves as to the merchant marine, which accords the water carrier

---

4 We have regularly considered a violation of navigation rules from the standpoint of cause in collision cases, and not as a rule of absolute liability. See, among recent cases, Construction Aggregates Co. v. Long Island R. Co., 2 Cir., 105 F.2d 1009; The Richard J. Barnes, 2 Cir., 111 F.2d 294, 296; The Cornelius Vanderbilt (The Watuppa), 2 Cir., 120 F.2d 766; The Sanday, 2 Cir., 122 F.2d 325.

full protection against the negligent navigation of its own servants. Robinson on Admiralty, 1939, 495-503.

 The owner of the vessel cross-assigns error in the limitation of its recovery of costs in the proceeding for exoneration to one docket fee, although there were twenty-six different claimants therein. Since each of the twenty-six claimants, if successful, might have charged a docket fee against this petitioner, we think it only fair that he be allowed to charge the same number against them. The Salvore, 1931 A.M.C. 1526; cf. The Horaisan Maru, 1935 A.M.C. 982.

The decree granting the ship and each of the carriers exoneration from liability and dismissing the libel is affirmed. The order as to costs is modified to allow the petitioner a docket fee from each of the claimants.

FRANK, Circuit Judge (dissenting).

My dissent is based largely upon a difference of understanding as to the meaning of the rule laid down in The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148: In that, and succeeding cases, the Supreme Court has held that the federal courts, when sitting in admiralty, must regard the violation of a statute designed to prevent accidents as a peculiarly serious transgression. In The Pennsylvania, the Court said: "But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing *not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been"*;[5] the Court also uses the locution "in no degree occasioned by that failure". In The Martello, 153 U.S. 64, 75, 14 S.Ct. 723, 727, 38 L.Ed. 637, citing The Pennsylvania, the phrasing of the rule is that the offending

ship has the burden of proving that the statutory violation "could not *by any possibility have contributed * * *."*[6] The Pennsylvania rule is applicable to a stranding; see Richelieu & Ontario Navigation Co. v. Boston Insurance Co., 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398.

I think that the majority opinion and the District Court have not sufficiently observed that, once a violation of a statute has been shown, then, under The Pennsylvania rule, the usual doctrine of so-called "proximate cause"[7] becomes inapplicable. Speaking generally, under the "proximate cause" rule, a plaintiff, to recover, must show more than a factual causal relationship; he must show both (1) that the defendant's act or omission was factually (i. e., when regarded "scientifically") in the chain of causation leading to the plaintiff's damage; and also (on grounds of legal policy established by the courts) that (2) the plaintiff's damage was the reasonably forseeable ("probable") consequence of the defendant's act or omission.[8] It is for that reason that liability is usually excluded if there intervenes, between defendant's act or omission and the plaintiff's damage, some act or event not reasonably forseeable. In cases where the proximate cause rule applies, it is, then, not at all sufficient, in order to shift the burden of proof, that the plaintiff show that the defendant's act or omission could "by any possibility have contributed" to the plaintiff's damage. Thus in Chicago, B. & Q. R. Co. v. Gelvin, 8 Cir., 238 F. 14, 23, L.R.A.1917C, 983, a proximate cause case, the Court said: "To impose such a standard of care as requires, *in the ordinary affairs of life,* precaution on the part of individuals against *all the possibilities which may occur,* is establishing *a degree of responsibility quite beyond any legal limitations which have been declared".* But that is precisely the standard which is imposed, in admiralty, where it is proved that there has been a statutory violation followed by a subsequent stranding; the burden of proof is then on the ship of "disproving a causal relationship,"[9] i. e.,

---

[5] Italics added.

[6] Italics added.

[7] Cf. the remarks of Judge Learned Hand as to that phrase: "Nothing would indeed be gained by addition to the volume of comment upon that phrase, particularly as nobody has ever been able to extract any practical guidance from it". Cusson v. Canadian Pacific Ry. Co., 2 Cir., 115 F.2d 430, 432.

[8] Under that rule, when applicable, proof that a defendant has violated a statute is not enough to establish a plaintiff's cause of action; the plaintiff must show that the statutory violation was (1) in the factual causal chain leading to the injury, and also (2) that the injury was a reasonably forseeable consequence of the violation.

[9] I quote these words from the major-

of showing that the violation *"could not* by *any possibility* have *contributed"* to the stranding; see The Pennsylvania, supra; The Martello, supra. The "proximate cause" rule is, in such a case, inapplicable.

The rule of The Pennsylvania, the lex fori, is, I think, applicable to this stranding, although it occurred in non-American waters. For, since (as the majority says) it is not a rule of absolute liability, I regard it as one of procedure, not of substantive law. Those cases are not relevant in which the burden of proof is an element of the plaintiff's cause of action; here the presumption only arises if cargo first proves that a statute was violated by the ship. We obtain some illumination from Sibbach v. Wilson & Co., 312 U.S. 1, 11-14, 61 S.Ct. 422, 85 L.Ed. 479; there the court held that the words "substantive rights" as used in the Act of June 19, 1934, 28 U.S.C.A. §§ 723b, 723c, did not mean "important" or "substantial" rights.[10] There is an additional consideration: It is elementary that the doctrines of conflict of laws are part of the domestic law; that, accordingly, when courts, in accordance with their domestic conflict of laws doctrines, borrow and apply a rule of another jurisdiction, in the very act of doing so, they are, in truth, applying their own domestic law; that any country may refuse to apply any doctrine of so-called conflict of laws, and will refuse to do so when it involves the application of a foreign rule of law at variance with domestic policy. It may well be that the burden of proof rule of The Pennsylvania involves an important issue of policy of that kind, and that, therefore, that rule should not be abandoned, when suit is brought in our courts, in favor of a different rule of law of the foreign country which, quite by chance, happened to be the place where the casualty occurred. Cargo has a slim chance at best, for it must rely exclusively on the testimony of the ship's officers and crew as to what preceded the

casualty; and admiralty courts have often recognized that such witnesses almost invariably will testify on behalf of their ship. See cases collected in Moore, Facts (1908) Sections 8, 501, 523, 1021, 1110; Cf. Coxe Admiralty Law, 8 Col.L.Rev. 172, 181 (1908). Moreover, it is salutary that our courts should do what they can to see to it that legislation like the Norwegian statute is obeyed.

If The Pennsylvania rule is applicable, the question then arises whether there was a violation of the Norwegian statute. On that subject the trial court made no satisfactory finding. The record shows that many striking deviations were recorded solely in the log book and not in the compass book; in such circumstances, it would seem that the records were not readily accessible when a course was being charted by compass; consequently, it was highly likely they would not then be used. As the Norwegian statute specifically required such recordings in the accessible compass book, it would appear that both the purpose and the letter of the statute were substantially violated.

The District Court, to be sure, found that deviations were "checked by daily observations, *many of which* were recorded in the compass book". [31 F.Supp. 15.] But the Court did not find—a very different matter—that *all* of the *significant* deviations were entered in the compass book. We are left to assume that they were not. True, the Court also found that "the fact that *all the observations* were not recorded in one book would not necessarily render the vessel unseaworthy". But that is not a finding of fact. It is a conclusion of law, involving interpretation of the Norwegian statute; moreover, it tells us nothing of the Court's belief as to the effect of the statute where *significant* observations were not noted in the compass book. It follows that the District Judge made no finding of fact which leads to the conclusion that the Nor-

ity opinion. Of course, under The Pennsylvania rule, there is no more than such a burden; the proof of violation does not create an irrebuttable presumption. The majority opinion errs, I think, in intimating that anyone has urged that the rule creates "an absolute penalty for default". Cargo argues only that "under well-settled precedents such violation must be held a participating cause of the disaster, unless the contrary is shown", Henry DuBois Sons Co. v. A/S Ivarans Rederi, 2 Cir., 116 F.2d 492, 493.

[10] Too much weight should not be given to cases arising under Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, because there the dominant purpose is to avoid a situation in which "the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side". Klaxon Company v. Stentor Electric Manufacturing Company, Inc., June 2, 1941, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477.

wegian statute was not violated. Having great respect for Judge Woolsey's abilities as an admiralty judge, I would remand the case to him for definite findings on that subject.

Of course, to do so would be nugatory if it were clear from the record that, even if the statute were violated, cargo could not recover, under The Pennsylvania rule. But here again, we lack a definite finding of fact. The question is whether those violations could "by any possibility have contributed" to the stranding. Cargo contends that they could. It argues that such violations caused the compass deviations to be inaccessible; that that inaccessibility led to gross inaccuracies in previous chartings by compass; that this, in turn, in all likelihood meant that the master had no confidence in his chartings; that, on the voyage in question, that lack of confidence very probably induced him to ignore the charted course and to rely on a radio bearing, as mistakenly recorded by the second mate, which showed an erroneous position strikingly at variance with the position according to the course charted by compass; and that that reliance on that error of the second mate caused the stranding.

That contention is highly plausible. There is no doubt that the record contains much evidence that, on prior voyages, the course charted by compass had been strikingly inaccurate; evidence was offered by the ship to explain these facts, but the District Judge made no finding, one way or another, with respect to them.[11] Had he done so, I should be strongly inclined to follow his findings; I would now remand for that purpose. But, until and unless the District Court, on a remand, makes such a finding, the evidence on behalf of cargo is sufficiently strong so that we should assume that, on the previous voyages, the courses as charted by compass were frequently substantially erroneous. Such substantial errors could easily be due to the violation of the statute; for the important deviations, if recorded merely in the log book—and thus not readily accessible when the course was being charted by compass— may well have resulted in a failure to make adequate corrections when the course was thus charted. And such facts would justify an inference that, because the master knew of the statutory violations (i. e., the

failure to record significant deviations in the compass book) he had little or no confidence in his chartings by compass and, therefore, relied primarily upon other devices in navigating. The facts that deviation in the southwest quadrant had never been greater than three degrees and that one such deviation was entered in the compass book would not militate against a general lack of faith in the compass; there was no more reason for the master, merely because of the correct entry of one of many deviations of similar magnitude, to trust more in the readings in this one quadrant than in those of any other, as to several of which there were seemingly important unrecorded or unavailable deviations. He knew that there had been violations of the statute (i. e., failures to record many significant deviations in the compass book) and there is nothing to indicate that he knew that, if all the significant deviations in this quadrant had been there recorded, they would not have shown a deviation greater than was shown in that single recording.

A finding that he lacked faith in his compass would justify cargo's contention, which, more in detail, is as follows: On the voyage in question, the course was laid out by compass on the chart. Subsequently, in order to repair the engines, the ship was permitted to drift for about three hours. At that time, the second mate was directed to obtain a radio bearing. This he did; but he recorded it inaccurately. As a result, the position shown, according to his mistaken recording, was many miles from the ship's actual position. The captain seemingly knew that the drift of the ship during the preceding two and one-half hours was to the west; although there is some testimony on his part to the effect that he was not aware of that fact, his charting of the position is a fact, occurring at the time, which more eloquently attests his belief that the drift had been westward. Even if the master had been only an amateur navigator, yet, looking at the course as originally charted by compass, and knowing that the drift was westward, he would have been shocked at the position shown according to the second mate's recording of the radio bearing— provided the master believed that the course originally charted by compass was reliable.

---

[11] For that reason, I do not believe the majority is justified in saying that previous discrepancies were "not relevant" to the performance or reading of the compass.

Had he been thus shocked, he would have called for an explanation of the radio bearing as recorded. The result would have been that the second mate's error would have been detected—and the stranding would not have occurred. The violation of the statute is thus in the factual causal chain; and it could "possibly have contributed" to the stranding.

The cogency of this reasoning depends on whether or not the master knew of the westward drift. The evidence, though indecisive, tends to indicate that he did. The point P on the chart is the 1:45 position as fixed by the supposed sighting of Prim Point Light and by the first radio bearing.[12] The point Q is the position computed under the master's direction at 2:50, when the engines were started. *The computation shows a southerly and westerly drift.*[13] *That computation is fatally inconsistent with the apparent southeasterly drift from the charted midnight position to the 1:45 position.*[14] I find it inconceivable that the master could have thought the currents were so utterly erratic that the ship would drift southeasterly between midnight and 1:45 a.m., a distance almost five times as far as it would drift, in a southwesterly direction, between 1:45 a.m. and 2:50 a.m. It is not difficult to believe that the line drawn between his midnight and 1:45 a.m. positions was a mere formal act of the master to connect (1) a position he never seriously thought he was at, with (2) one which he erroneously thought correct; and that, since he did not take the line seriously, he was not aroused by the fact that it went opposite to the current, and so did not bother to check the accuracy of the second mate's plotting of the radio bearing.

My colleagues suggest, as showing that the master thought the currents entirely unpredictable, that he was not surprised at his charted course from 2:50 to 4:00. As to that, however, the court below made no finding. The only reason which one could conjecture for thinking that the master was not surprised is that, instead of rechecking his course, he immediately steered westward. But the evidence shows that at 3:51 a cross bearing was obtained from Yarmouth, which showed him to be close to the Northwest Ledge. According to the trial court: "He was in a fog. Therefore, to escape what he believed to be immediately impending danger he changed his course sharply at 4 a.m. * * *" The fact that, finding himself in such apparent danger, he did not take the time to recheck his course, would hardly prove that he thought the currents utterly erratic. Even if he was surprised, he might well have thought it would be better to avoid the apparent immediate danger and recheck later. Furthermore, there was more reason for surprise at 2 o'clock than at 4, when his mistaken course had apparently been corroborated by at least two additional radio bearings.

I said it was "inconceivable" that he should have thought the currents were so erratic, but I suppose it was not impossible. For, although in replotting the course Judge Woolsey had no hesitation about using the current tables, which showed a west southwesterly direction, the master did testify that "we drifted about three hours without any kind of log or anything else to prove which way the ship would drift". This general testimony, and similar statements, must, however, be regarded as qualified by his testimony that he did know the *direction* of the current:

Q. And did you have a chart which showed the direction of the tide, the set of it? A. Oh, yes, the usual chart.

Q. You knew the general set of the tide? A. Oh, yes.

The Canadian Government's Table of Currents in the Bay of Fundy, which is in the record, says flatly: "* * * a change

---

[12] Respondent interprets point P as being a 2:30 fix, correlating the Prim Point Light observation with the first radio bearing, and this is perhaps a possible explanation of the testimony. Assuming this interpretation is correct, it does not, of course, affect my conclusion that, in plotting line P-Q to reflect drift, the master unequivocally showed that he knew the drift was southwesterly.

[13] There is the additional fact, which corroborates my impression that the officers knew the drift was westward, that when the third mate, upon sighting the Prim Point Light, found that the ship had apparently *drifted eastward*, he was so surprised that he called the master on deck. If, as is argued, there was no way of telling where the ship would drift, why was there surprise at the apparent eastward drift?

[14] The majority opinion suggests that the master may have had some "rationalization" of this conflict, but he offered none.

in position of even a few miles may make a marked difference in [the current's] character. This difference is chiefly in the strength and in the time of slack water, *and not so much in direction*". No doubt the current was uncertain, but in the whole record there is no unqualified testimony that the master did not know the *general direction*,[15] which is all he would have to know to be suspicious of the 1:45 a.m. fix, if he thought the midnight position, shown on the chart, was accurate. Since, however, there are contradictions in the record, I would remand for findings as to (1) the master's knowledge that his drift would be westward, and (2) the possibility that, if he had believed in his midnight position as plotted by dead reckoning, he would have been so astonished by the apparent southeasterly drift between then and 1:45, as to check on the radio bearing.

It is true that Judge Woolsey stated that the stranding was entirely due to the error of the second mate in erroneously laying out the radio bearing. He supports that "finding"—which is, after all, but a lump sum conclusion and not at all adequately detailed—by another "finding" to this effect: He divides the ship's movements into three different segments, the first being before her engines stopped, the second being the period of drifting, and the third what happened after the drifting was over; and he concludes that what occurred in the first segment had nothing whatsoever to do with what occurred in the third, because, he says, the second—the period of drifting—created a disjunction between the first and the third. This smacks of "proximate cause" reasoning as to the insulating effect of unforseeable intervening events; such reasoning, as we have seen, has no pertinence when The Pennsylvania rule applies. Moreover, Judge Woolsey, when making this particular "finding" as to such disjunction, paid attention neither to the master's knowledge of the westward drift, nor to the effect of the inadequate recording of compass deviations; the judge was, at that point, concentrating his entire attention on another and distinct contention advanced by cargo, which we all agree, is without weight, i. e., that the Norwegian statute was violated because of the use of an erroneous chart.

It is suggested that the line of reasoning employed by cargo to show that the violation of the Norwegian statute could by any possibility have contributed to the stranding, is highly tenuous because it involves the captain's "state of mind". That seems to imply that, in applying the standard of The Pennsylvania case, there must be excluded from consideration, as a link in the factual causal chain, normal mental operations, i. e., that such a factual causal chain is to be regarded as broken when one of its links is a normal, mental factor. I cannot agree. Even under the so-called proximate cause rule, there is no such doctrine. If the usual "state of mind" of a non-neurotic horse does not break the causal chain,[16] why should that of a man? Surely the courts have shown no such snobbishness about the functioning of the mind of an ordinary man. In The Pennsylvania itself, the Court took into account such a factor when it asked: "How can it be proved that if a foghorn had been blown those on board the steamer would not have heard it in season, * * * to check their speed or change their course * * *?" In a sense, this requires the psychological assumption that the navigator of a vessel, on hearing a fog horn, will react as a normal person. There are many cases in the books to support the conclusion that mental factors are not taboo when the courts are passing on questions of causation. See, e. g., Wagner v. International Ry. Co., 232 N.Y. 176, 133 N. E. 437, 19 A.L.R. 1, where Cardozo, J., said: "Danger invites rescue. * * * The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal". And here we must consider how, "by any possibility" the mind of the master, assuming it to be normal, would have operated.

---

15 I do not regard the master's ignorance as being established by such statements as the following, of which there are several in the record:

" * * * the Bay of Fundy, as we all know, has very strong tides going. Without seeing anything nobody can say sure where the ship stands."

Q. When you were called again just before two o'clock and you were told about this Prim Point Light bearing did you try to figure out then what the current had been doing to you? A. No.

Q. You figured you were at a certain spot and that is where the current took you? A. Yes.

16 City of Winona v. Botzet, 8 Cir., 169 F. 321, 23 L.R.A.,N.S., 204.

480

In the case as tried below, cargo went into a multiplicity of theories, with the consequence that the record is very large. Judge Woolsey in his findings was obliged to consider all those many theories; it may be that for that reason—and because the narrower issues now preserved were not as clearly presented to him as they were to us—he did not go into them in detail; that serves to explain, and justifies a reference to, his mistake in imputing all the navigation to the second mate. At any rate, Judge Woolsey, having concluded—on the basis of his inadequate finding of fact—that, as a matter of law, the Norwegian statute was not violated because of failure properly to record compass deviations, very probably did not feel it necessary to—and certainly he did not—make any adequate findings of fact negating the possibility that the statute, if thus violated, could have contributed to the stranding.

In a case of this kind, where the issues are far narrower when they reach this Court than they were below, we should hesitate to reverse when the trial judge has not made findings covering elements in the case which are important as we regard the case. Consequently, if my view of the applicable law were to be followed here, I should, for the reasons indicated, go no further than to remand the case for further findings on the questions noted in the foregoing.

As to the issue of costs, I concur with the majority opinion.

