**CONSUMERS IMPORT CO., Inc., et al. v. KAWASAKI KISEN KABUSHIKI KAISHA et al.**

**No. 120.**

Circuit Court of Appeals, Second Circuit.

Jan. 25, 1943.

T. Catesby Jones, of New York City, for appellants.

George C. Sprague, of New York City, for appellees.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This appeal comes before us from a decree in the admiralty exonerating the owner and the bareboat charterer of the S. S. "Venice Maru" from liability for damage to her cargo by a fire which occurred on board that vessel between Los Angeles and Balboa in August 1934. The appeal also involves the repayment by the bareboat charterer of certain cash payments made to it by cargo owners as contributions in general average. The decree directed the charterer to refund these and the charterer and the owner have filed cross assignments of error. We shall first consider the appeal of the cargo claimants.

The "Venice Maru," having previously stopped at several Japanese ports to take on cargo and being already partly filled, on July 5, 1934, touched at Kobe where she lifted a consignment of some 1900 tons of sardine meal in 38,000 bags, destined for Atlantic ports in the United States, via the Panama Canal. In No. 1 lower hold she stowed 13,312 bags; in No. 3 lower hold 11,848; in No. 6 lower hold, 6,735; and in No. 3 'tweendeck, 6,069. After Kobe she touched at Nagoya where she lifted 1,087 cases of porcelain goods which were stowed upon the weatherdeck, and later at Yokohama 595 more cases of porcelain were added, also as deckload. Thus, when she finally broke ground at that, her last Japanese port, on July 13th she had all holds full and a deck cargo covering most of her free deck space, among the rest the after two-thirds of No. 1 weatherdeck hatch. During the voyage to Los Angeles where she arrived on July 29th, she met with heavy rains that prevented her from ventilating the cargo as well as she had expected, but she suffered no misadventure. She discharged a few tons at that place, and left on July 30 for Balboa. The weather en route was good but hot, and early in the morning of August 6 smoke began to come out of the ventilator of No. 1 lower hold. Examination showed that some of the bags of sar-

dine meal there stowed had heated and were smoking, and fire finally broke out. Although only some 700 bags of meal were burnt or charred, much damage was done to the other bags and to other cargo by the water used to put out the fire. At Balboa or at Panama she discharged that part of her cargo which had been consigned to different Central, and South American ports, and restowed the sardine meal that was in lower holds 3 and 6. In restowing she divided this meal into small blocks with channels running between them; this was known as the "block and channel" method; it did not come into general use for sardine meal until 1935. At New York the charterer demanded general average guarantees, and in some cases cash, as a condition upon delivery of cargo, and later a general average adjustment was made. The cash payments are those involved in the cross-appeals.

The sardine meal laden at Kobe was well within the range of high grade Japanese sardine meal; the bags were proper, and the cargo was fit for carriage by sea from Kobe to New York when properly stowed and ventilated. No. 1 lower hold was from 20 to 23½ feet deep; above it was the lower 'tweendecks 9½ feet deep, and above that a second 'tweendecks, or shelter deck compartment, 8 feet deep. Six hundred and sixty-five tons of the meal—a little more than one-third of the whole consignment—were stowed in No. 1 hold, and occupied the entire hold except for a space of about a foot or eighteen inches along the bulkheads and along the sides of the ship, and for about the same space between the top of the stow and the overhead deck beams. A channel one foot wide ran athwartship through the middle, except for which the stow was a solid block. Five rows of "rice ventilators" ran fore and aft in the 5th, 10th and 16th tiers, and six rows athwartship in the 6th, 11th and 17th tiers; vertical ventilators connected these horizontal ventilators at the four corners of the hatch. Besides these there was a permanent ventilating system such as was usual in ships of her class.

Sardine meal, like other fish meal, when stowed on long voyages, is likely to heat and to take fire spontaneously; its susceptibility depends upon the percentage of moisture and oil which it contains. It had been a common cargo from Japan to Pacific coast ports in small parcels for five or more years before this voyage of the "Venice Maru," and no damage had ever occurred; the charterer had itself successfully carried it on over eighty voyages before September 1, 1933, and in one of these, that of the S. S. "Florida" on December 23, 1930, the cargo was nearly as great as on the "Venice Maru." The charterer's first shipment to Atlantic ports was on February 3, 1933, followed by eight other steamers—the largest consignment in which was 1100 tons: all came through undamaged. On September 1, 1933, however, the cargo of the "Montreal Maru," which had left Yokohama with 2300 tons, was found to have been in part heated at its outturn in New York on October 6. Three steamers followed to New York without incident, but on December 6th, the "Soyo Maru," which had left Yokohama on October 28, arrived in New York with about 1000 tons, also heated. Ten ships then followed to New York all without damage. On April 5, 1934, the "Soyo Maru" again left Yokohama with 1100 tons; the "Tohsei Maru" on the 25th with 560 tons; the "Nichiyo Maru" on the 28th with 1117; and the cargoes of all three heated. In the case of the last two this happened in spite of the use of "rice ventilators." The charterer attributed this to the quality of the meal itself, which had been manufactured at a small factory near Nagoya; and for that reason it refused to take any further meal from that shipper. Two cargoes were then despatched and arrived in good condition; but not so, the cargoes of the "Montreal Maru" leaving Yokohama on June 14th and arriving in New York on July 20th, or of the "Getsuyo Maru," leaving Yokohama on June 28th, and arriving in New York on July 29th. Although neither of these last two vessels contained any Nagoya meal and both carried "rice ventilators," the cargo of each heated.

After the charterer learned of the damage done on the three ships leaving in April, the latest of which, the "Tohsei Maru" arrived on June 1st, it not only gave directions to take no more of the Nagoya meal, but it retained one, Fegen, to take charge of the stowage of any future shipments, and the first ship which he stowed was the "Getsuyo Maru." He had been a marine surveyor for 23 years, all the time in Kobe acting as Lloyds' agent; he had surveyed all sorts of cargoes including sardine meal; before becoming a surveyor he had had twenty years sea experience from

seaman to captain; and he held a master's license both on British and Japanese ships. Although as a master he had never carried sardine or other fish meal, he had frequently carried another perishable cargo, rice, and was familiar with the use of "rice ventilators." It was he who had stowed No. 1 lower hold of the "Venice Maru" in the way we have described. The charterer's business was in charge of one, Okubo, who lived in Kobe, and who alone had the active direction of its affairs, although it had a president, who was inactive. Okubo knew of the previous heating of all the cargoes mentioned except those leaving in June; he did not tell Fegen of these when he retained him, and he paid no further attention to the stowage.

■ A preliminary question arises as to the liability of the ship in rem, assuming that the owner is not liable in personam. The claimants argue that the statute does not destroy any liens upon the ship, for it is to be read in pari materia with § 183 of Title 46, U.S.C.A. Such indeed appears to have been the opinion of the Fifth Circuit in The Etna Maru, 33 F.2d 232, which also held that unseaworthiness of the ship barred exoneration under the Fire Statute, 46 U.S.C.A. § 182. So far as that decision retains any authority after Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403, we cannot agree: § 182 gives complete exoneration of liability; § 183 only a limitation of liability. To say that an owner is completely exonerated, although one may arrest his ship and sell it, is a contradiction in terms, unless we are to think of the ship as a jural person capable of wrongdoing. That notion has indeed had its place in the law of the sea, but it is a bit of mythology, a fiction not to be applied to defeat a statute designed to protect and foster maritime enterprise. Whether, if the charterer were liable in personam, a lien would attach to the ship on the theory that a bareboat charterer is the owner pro hac vice, we need not say, for, as will appear, we agree that it was not liable in personam.

■ It could be so only in case the fire was "caused" by its "design or neglect"; and "neglect" means personal, and not imputed, negligence. Earle & Stoddart v. Ellerman's Wilson Line, supra, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403. Only Okubo and Fegen can be even plausibly suggested as standing in the required relation to the charterer; and, although

Okubo certainly did stand so, Fegen did not. Since the claimants argue otherwise we will consider the evidence in a little detail. In answer to interrogatories Okubo swore that "in case of sardine meal" the charterer "employed * * * Fegen to advise with the masters and chief officers on its loading and stowage in their respective vessels." Again, that the master and chief officer of the "Venice Maru" "supervised" the stowage "and, insofar as the loading and stowage of sardine meal was concerned, were advised by Mr. F. H. Fegen." Upon letters rogatory he swore that the charterer "employed * * * a surveyor * * * to inspect stowage on every vessel." Fegen swore that he "was appointed by Cornes & Co. at Kobe to lay out the manner and method of stowage of the sardine meal and to supervise such stowage * * * and I believe that Cornes & Co. were employed by Kawasaki Kisen Kabushiki Kaisha"; that he did so, "and gave instructions to Chief Officer of the 'Venice Maru' regarding manner and method of the stowage and arrangement of ventilation and also exercised supervision over said stowage and ventilation." This was very far from making Fegen the local manager at Kobe. It was Okubo who had that position, and whose personal dereliction was necessary to fix any liability upon the charterer for damage by fire. Earle & Stoddart v. Ellerman's Wilson Line, supra, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403; Williams S. S. Co. v. Wilbur, 9 Cir., 9 F.2d 622; United States v. Charbonnier, 4 Cir., 45 F.2d 174. The test is the same as that under the Limitation Statute § 183, Title 46, U.S.C.A. Craig v. Continental Insurance Co., 141 U.S. 638, 646, 12 S.Ct. 97, 35 L.Ed. 886. Unless therefore Okubo was personally guilty of some negligence, the charterer was exonerated.

■ The claimants say that he was so guilty because he knew of the heating of the meal in the autumn of 1933 upon the "Montreal Maru" and the "Soyo Maru," and upon the three ships in April, 1934, and because it was not enough merely to turn over the stowage to Fegen; particularly as he did not tell Fegen of the heating on the earlier voyages. In addition they say that Okubo was personally chargeable because two-thirds of the hatch of No. 1 hold was covered with deck cargo; and finally, because he did not detain the "Venice Maru" at Los Angeles and restow the meal after news had reached Japan that

the cargo on the "Getsuyo Maru" had gone wrong. We agree that, although Okubo was not personally acquainted with what was necessary to protect the meal on such a long voyage, he had had ample notice that it was subject to heating. Moreover, heating can lead to fire, and failure to prevent heating would be a "cause" of any resulting fire. If therefore, in July, 1934, Okubo had taken no action the charterer might well have been liable. Hines v. Butler, 4 Cir., 278 F. 877, 880; Williams S. S. Co. v. Wilbur, 9 Cir., 9 F.2d 622; Bank Line v. Porter, 4 Cir., 25 F.2d 843; The Elizabeth Dantzler, D.C., 263 F. 596. We think that he took adequate action.

■ · He believed that the three April cargoes which went wrong (in spite of the use of "rice ventilators" in two of them) had carried bad meal, and, as we have said, he stopped all shipments from Nagoya. Two cargoes then came through safely, which, according to Kitamura, did not carry Nagoya meal. But Okubo did not rest with this, for he also retained Fegen. The claimants say that Fegen was not shown to have been competent, or at least that Okubo had no means of knowing whether he was. Fegen had had long experience at sea and ashore in the stowage of ships and the ventilation of cargoes, although he had had no actual sea experience with sardine meal, or apparently with other fish meal. The stowage of sardine meal was still in flux; it was not till the next year that "block and channel" stowage became the standard; and, although it is true that the larger the solid block and the longer the voyage, the more likely the meal is to heat, "rice ventilators" had for long been an accepted way of ventilating other heating cargoes. In July, 1934, it had not yet certainly appeared that, given properly made meal, such ventilators were not adequate to protect even such a large single block as half of 665 tons. (We say "half" advisedly, because, as we have said, the stow in No. 1 lower hold was cut into two blocks by a channel one foot wide.) There is not the least evidence that anyone better qualified was available at Kobe, or, indeed, anywhere else in Japan. Nor can we say that Okubo's failure to tell Fegen of the earlier cargoes that heated, was negligent. He was justified in assuming that Fegen would familiarize himself with the charterer's past experience by inquiring of its masters. Besides, even if it was negligent not to inform him, it does not appear that Fegen did not inform himself; or that, if he did not, his ignorance made any difference: i. e. that his knowledge of the charterer's past experience would have led him to discard "rice ventilators." Since the claimants have the burden of proving "neglect" under this statute—unlike the Limited Liability Statute—they must in any event fail upon this issue, for by no stretch can it be said that they proved that the fire was "caused" by Fegen's ignorance of the charterer's past experience. The Strathdon, D.C., 89 F. 374, 378; The Salvore, 2 Cir., 60 F.2d 683; The Older, 2 Cir., 65 F.2d 359.

■ The next claim is that the "Venice Maru" not only carried deck cargo, but stowed it upon the after two-thirds of No. 1 hatch. On July 11th the charterer received the cable of the "Venice Maru's" master at Kobe, saying that he had laded 450 tons of deck cargo and wished tarpaulins to be supplied him at Yokohama. Kitamura showed this to Okubo on the 16th, three days after the ship had left Yokohama, her last Asiatic port of call. Okubo could have done nothing till she got to Los Angeles, and nothing in the cable suggested that any part of the deck cargo was over the hatch. Nor could Okubo have done anything when he learned that the cargo of the "Getsuyo Maru" had heated. That vessel reached New York on July 29, the day that the "Venice Maru" reached Los Angeles. There is no evidence when Okubo first learned that the meal had heated, except of course that it could not have been before the 29th. It is most unlikely that he heard of it before the 30th, the day when the "Venice Maru" left Los Angeles. We must not clutch at such straws to find liability, or construe the Fire Statute grudgingly. Congress has in many other ways changed the law of shipping since it was passed, but in the eternal conflict between hull and cargo, the hull has been able so far to hold this ground; and in its last decision the Supreme Court showed no hostile disposition towards the statute. Earle & Stoddart v. Ellerman's Wilson Line, supra, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403. We hold that the charterer and the owner were entitled to exoneration, and that on this, the chief issue, the decree should be affirmed.

■ The charterer and the owner challenged the finding that the stowage had been negligent and made the ship unseaworthy. If the stowage was such as

made a fire likely, they apparently agree that she was unseaworthy; and she was, whether they agree or not. It follows that, if due diligence was not used in her stowage, due diligence was not used to make her seaworthy. Moreover, as to this issue, we are to look not alone to Okubo's conduct, for that duty is not delegable, although this the charterer and the owner dispute. The ship's bills of lading provided: "If the shipowner shall have exercised due diligence to make the steamer * * * seaworthy * * * in case of * * * damage * * * resulting from accident * * * or from unseaworthiness * * * if the * * * unseaworthiness was not discoverable by the exercise of due diligence" the cargo should contribute in general average. The charterer argues that, although it is true in cases arising under the Harter Act, 46 U.S.C.A. §§ 190–195, the owner must show that due diligence has been used in order to hold a shipper for contribution in general average, it is because the Harter Act forbids an owner to relieve himself of the duty to use due diligence. But it says that that is not true under the Fire Statute which permits the owner to delegate all his duties to others, provided he selects proper delegates. Hence an owner may provide for contribution in general average to fire losses, although due diligence has not been used to make the ship seaworthy; and the doctrine of The Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969, does not apply to the full. We need not decide that question, because in any event the bills of lading must themselves provide for contribution notwithstanding the lack of due diligence to make the ship seaworthy. If they do not, the doctrine of The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130, applies, and the owner being in unexcused fault cannot exact contribution.

█ The charterer says that the bills of lading did so provide because of the introduction in them of the word, "accident," which appears in the quoted language. We are not indeed clear what that added, but it makes no difference, for even if it covered a fire, the whole clause was subject to its introductory condition: "the shipowner shall have exercised due diligence to make the steamer in all respects seaworthy"; and to the later clause: "if the defect or unseaworthiness was not discoverable by the exercise of due diligence."

Certainly, when these two are read together, they cover more than a personal default of the shipowner; being primarily applicable to cases arising under the Harter Act, they make it a condition that due diligence shall have been exercised to make the ship seaworthy: i. e., in the case at bar that she was so stowed as not to be likely to catch fire. Thus arises the correctness of the judge's findings that the "stowage was negligent and made the vessel unseaworthy."

█ An immense amount of testimony was taken as to the proper stowage of such cargo; and a very large part of it, especially that of expert surveyors and master mariners, was taken in court. The judge found, not only that the stowage was negligent, but that Fegen had not used "due diligence" to make the vessel seaworthy. Should we say that this finding was "clearly erroneous"? Petterson Lighterage & Towing Corporation v. New York Central Railroad Co., 2 Cir., 126 F.2d 992. The proper stowage of sardine, or other fish, meal has come before the courts in several cases and it so happens that the ship has always been found guilty of bad stowage. The Willfaro (Wilbur v. Williams S. S. Co.), D.C., 9 F.2d 940, affirmed 9 Cir., 9 F.2d 622, supra; The Niel Maersk, D.C., 18 F.Supp. 824, affirmed as to the stowage 2 Cir., 91 F.2d 932; The Nichiyo Maru, D.C., 14 F.Supp. 727, affirmed 4 Cir., 89 F.2d 539. That does not of itself answer the question at bar, for each stow is different, but Judge Chesnut's careful analysis of the evidence in the case of the three April, 1934, ships of the charterer now at bar, fits very closely here. As a new question we should be somewhat tempted to accept the opinion of the claimants' expert, Eriksen, that, by itself, the stowage "was about on the minimum of adequateness" before the covering of the hatch blocked the vertical "rice ventilators" which came up to its after side; but that when it was covered that "destroyed the minimum requirements of ventilation." Again we should be disposed to believe that the "rice ventilators" were themselves not adequate. At least so thought the two surveyors who saw the discharge at Balboa, and who said that they were too fragile anyway. We do not forget that the master of the "Venice Maru" swore that these surveyors had not seen the ventilators in place and that they were broken on the discharge, but that does not answer their testimony. Nor do

we forget the sharp dispute as to whether it affected the ventilation of the stow to cover the hatch, although it surprises us to have it said that it should not, especially since the hold was plainly planned to be ventilated at all four corners. We do not think it necessary to hold that the use of "rice ventilators" was of itself negligence. As we said at the outset, the proper stowage of such meal was still in flux in the summer of 1934, although the "block and channel" method turned out in the end to be better than "rice ventilators," in spite of the opinion of one expert. But in the case at bar there was evidence that the "rice ventilators" had not been themselves adequate and that the deck cargo obstructed them. We can have no assurance that out of the confusion and contradiction of such a record, we can come to a more reliable result than the judge. We cannot know, for example, how far he was led to find as he did by the testimony of those witnesses whom he saw; and, indeed, even as to those whom he did not see, his conclusions have some prima facie weight; we are entitled to attribute some value to his sifting of the evidence. We will not say therefore that the findings were "clearly erroneous."

We see no reason to disturb the award of costs. Karrick v. Edes, 57 App.D.C. 219, 19 F.2d 693; The Aakre, 2 Cir., 122 F.2d 469, 475.

Decree affirmed.